1
2
3
4
5
6

**CLARKSON LAW FIRM, P.C.**
Glenn A. Danas (SBN 270317)
*gdanas@clarksonlawfirm.com*
Cody Laux (SBN 359748)
*claux@clarksonlawfirm.com*
Maxim Gorbunov (SBN 343128)
*mgorbunov@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Facsimile: (213) 788-4070

7
8
9
10

**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (SBN 263291)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (202) 998-2299

11

*Attorneys for Plaintiff and Putative Class*

12

### UNITED STATES DISTRICT COURT

13

### NORTHERN DISTRICT OF CALIFORNIA

14
15

VALERIE WENNING and CHERITY BENTLEY, individually and on behalf of all others similarly situated,

16

Plaintiffs,

17

v.

18
19
20
21

SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive,

22

Defendants.

Case No.: 3:25-cv-04936-EMC

**FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT**

1. Failure to Pay Minimum Wage and Liquidated Damages (Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001);
2. Failure to Pay Overtime Wages and Liquidated Damages (Cal. Lab. Code §§ 510, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001);
3. Failure to Provide Rest Periods or Rest Break Premium Wages (Cal. Lab. Code §§ 226.7, 558.1; IWC Wage Order 4-2001);
4. Failure to Provide Meal Periods or Meal Premium Wages (Cal. Lab. Code §§ 226.7, 512(a), 1198, 558.1; IWC Wage Order 4-2001);
5. Failure to Timely Pay Wages During Employment (Cal. Lab. Code §§ 204, 210(a), 218.6);
6. Failure to Timely Pay Wages Upon Separation (Cal. Lab. Code §§ 201-203, 558.1);
7. Failure to Keep Requisite Payroll Records (Cal. Lab. Code §§ 1174(d), 1174.5);
8. Failure to Provide Timely and Accurate Wage Statements (Cal. Lab. Code §§ 226(a),

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1198, 226.3, 558.1, 226(e));
9.  Failure to Reimburse Business Expenses
    (Cal. Lab. Code §§ 450, 2802, 558.1; IWC
    Wage Order 4-2001);
10. Breach of Contract
11. Unfair Competition (Bus. & Prof. Code §
    17200 et seq.)
12. Violations of the Private Attorney General
    Act (Cal. Lab. Code §§ 2698-2699.8)

**JURY TRIAL DEMANDED**

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................4

III.  THE PARTIES .......................................................................................................5

IV.   FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED EMPLOYEES ......9

      A.    Scentsy Is a Successful Multilevel Marketing Company That Is Dependent on its Consultants to Engage in Social Media Marketing on Its Behalf ...............................9

      B.    Scentsy Consultants Are Employees ...........................................................12

            1.    Controlling Law .................................................................................12

            2.    Consultants Are Not Free from Scentsy's Control .........................14

            3.    Consultants' Work Is Not Outside Scentsy's "Usual Course of Business"...17

            4.    Scentsy Cannot Meet Its Burden To Show That Consultants Are "Customarily Engaged" in a Separate Business ............................................18

            5.    Scentsy Consultants Are Not "Direct Sellers." ..............................20

                  i.    Background on MLMs and the Direct Sales Exemption. .......................20

                  ii.   Scentsy Consultants Do Not Perform the Jobs Identified in the Direct Sales Exemption...................................................................21

                  iii.  Scentsy's Modern E-Commerce Business Is Unlike Past and Present Direct Sales Companies. ...........................................................24

            6.    The Terms and Conditions in the Consultant Agreements are Unconscionable, Unfair, and Unlawful. .......................................................25

      C.    Scentsy's Misclassification of Plaintiff and Consultants Was Willful. ...................27

      D.    Scentsy Breaches the Terms of its Compensation Plan in the Primary Agreements.29

      E.    Scentsy's Misclassification of Consultants and Unfair Business Practices Harm the California Public. .................................................................................31

            1.    Scentsy Uses Widespread Advertising Practices Directed at the General Public to Recruit New Consultants.............................................................31

        2.     Scentsy's Unfair and Unlawful Conduct Harms California In Other Ways..33

    F.     Plaintiff's Experiences as a Scentsy Consultant ......................................34

        1.     Plaintiff Valerie Wenning ...................................................34

        2.     Plaintiff Cherity Bentley ....................................................38

V.   CLASS ALLEGATIONS ..............................................................................41

VI.  FACTS RELATING TO PLAINTIFFS AS A PRIVATE ATTORNEY GENERAL ..........44

VII. CAUSES OF ACTION .................................................................................46

    FIRST CAUSE OF ACTION ........................................................................46

    SECOND CAUSE OF ACTION ....................................................................48

    THIRD CAUSE OF ACTION ......................................................................49

    FOURTH CAUSE OF ACTION ....................................................................51

    FIFTH CAUSE OF ACTION .......................................................................52

    SIXTH CAUSE OF ACTION ......................................................................53

    SEVENTH CAUSE OF ACTION ..................................................................54

    EIGHTH CAUSE OF ACTION ....................................................................55

    NINTH CAUSE OF ACTION ......................................................................57

    TENTH CAUSE OF ACTION .....................................................................59

        Request for Declaratory Relief ................................................60

        Breach of Contract Damages ..................................................60

    ELEVENTH CAUSE OF ACTION ................................................................61

        "Unlawful" Prong ...............................................................62

        "Unfair" Prong ..................................................................62

    TWELFTH CAUSE OF ACTION...................................................................64

VIII. PRAYER FOR RELIEF ...............................................................................66

IX.   DEMAND FOR TRIAL BY JURY .................................................................67

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Plaintiffs Valerie Wenning and Cherity Bentley ("Plaintiffs") bring this action, individually, and behalf of a class of similarly situated individuals, against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, (collectively, "Defendants" or "Scentsy"). Plaintiffs' allegations against Defendants are based upon investigation carried out by Plaintiffs' counsel, except for allegations pertaining specifically to each Plaintiff, which are based upon each Plaintiff's personal knowledge.

## I.    INTRODUCTION

1.    Scentsy is a massively successful company that, for years, has exploited its California salesforce by misclassifying its workers as independent contractors rather than as employees. Plaintiffs were Scentsy "Consultants", formerly two of the more than 100,000 active sales workers in the United States who sell Scentsy products through their online networks under Scentsy's strict direction and control. In exchange for Consultants' work promoting the brand on social media, acquiring new customers, engaging existing customers, providing customer service, recruiting and training new Consultants, and driving traffic to Scentsy's website, Scentsy pays them, at most, a paltry commission.

2.    Headquartered in Meridian, Idaho, Scentsy develops and sells a wide range of fragrance products, such as scented wax bars, wax warmers, fragrance diffusers, scented oils, air purifiers, scent pods, personal care goods, cosmetics, and cleaning supplies. Pursuant to Scentsy's business model, it establishes relationships with various individuals known as "Consultants" who market and sell Scentsy products. Scentsy has spent a great deal of time and resources in implementing and managing a broad range of employment policies and procedures for "Consultants." Despite designating these salespeople as independent contractors, these "Consultants" are in fact Scentsy employees under California law. Scentsy has violated numerous provisions of the California Labor Code and applicable IWC Wage Order by denying its Consultants the compensation, benefits, and statutory entitlements that they are owed.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

3.      Scentsy maintains a centralized, rigorous, and stringent sales policy to which each of its Consultants must rigidly adhere should they expect any commission for their sales of Scentsy products. Even when these Consultants do follow Scentsy's exacting direction to the tee, the majority of Consultants fail to even break even, having sunk substantial personal investment into Scentsy inventory—business expenditures which Scentsy shifts onto their frequently financially insecure, female workers and which Scentsy refuses to reimburse.

4.      Via its pervasive marketing and sales guidelines, Scentsy directs Consultants to market and sell a variety of consumer products, including scented wax bars, wax warmers, fragrance diffusers, scented oils, air purifiers, scent pods, personal care goods, cosmetics, and cleaning supplies. In exchange for the Consultants' work promoting the brand on social media, referring new customers, providing customer service, and driving traffic to Scentsy's website, Scentsy pays Consultants at most a paltry commission.

5.      Scentsy's ability to avoid accountability to its employees thus far—turns on the fact that it operates as multi-level marketing business ("MLM").[1] Scentsy's recruitment tactics purportedly promise its Consultants the opportunity to build a business; in reality, however, they supply free marketing and sales support that would otherwise cost Scentsy a staggering amount.

6.      California legislature's codification of the "ABC Test" in AB 5 did include a "direct sales" exemption, which incorporated a definition appearing in a 40-year-old statute, California's Unemployment Code § 650. Among other things, the exemption is expressly limited only to those salespersons making "in person" sales, such as door-to-door salespeople and home "Tupperware party" hosts. It does not cover Scentsy's modern, online business model, where Consultants drive social media engagement under Scentsy's guidance and direction, directing consumers to Scentsy-controlled websites, where Scentsy accepts and processes the sales and fulfills the orders, while also collecting and benefiting from the consumer data it acquires from these leads. The result is a coordinated marketing campaign that increases exposure and awareness of the Scentsy products and is essential to the company's ability to reach new customers.

---

[1] Gerald Albaum & Robert A. Peterson, *Multilevel (Network) Marketing: An Objective View*, 11 MARKETING R. 347, 347–61 (2011).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

7.     As articulated in Scentsy's own Privacy Policy, attached hereto as **Exhibit A,** "all [Scentsy] orders must be placed through your PWS [Personalized Website Subscription] or Consultant Workstation." Ex. A at § 4(B). Scentsy Personalized Website Subscriptions, hereinafter referred to as "Replicated Websites," are "the only online channel in which [a Scentsy] sales transaction may take place and the only way to enroll new Scentsy Consultants online." *Id*. at § 4(A). Replicated Websites display the same Scentsy website as normally shown, but with "[Consultant's Name], Scentsy, Consultant" displayed in the top left corner. Consultants cannot edit the content, text, photos, prices, or any aspect of the Replicated Website, which only serves to give them credit for sales. Consultant Workstations are "online hub[s], managed by Scentsy, where [Consultants] place and track orders, set up [their] events, track sales, get information on news and events and much more." *Id*. at § 7. In essence, Scentsy is sold online.

8.     Scentsy strictly controls the work product of its Consultants, in part by ensuring that they follow its rigid guidelines for marketing content and recruiting materials. Just one example of its exacting control is the way in which Scentsy's compliance team enforces the 25-page Scentsy Compliance Guide, attached hereto as **Exhibit B**, which spells out Scentsy directives for Consultants' pricing and advertising activities, production of marketing materials, and marketing of Scentsy online, *inter alia.* The introduction to the Compliance Guide states that "failure to comply with the Scentsy Standards may result in the suspension and/or cancellation of your Consultant account." Ex. B at 1. Scentsy's direction and control of its Consultants' work product is all encompassing and extends far beyond the directives outlined in the Compliance guide.

9.     Plaintiffs were victims of Scentsy's practices. Like all Consultants, in accordance to Scentsy's strict marketing and sales protocols, Plaintiffs were trained by other Consultants and through Scentsy materials, and were required to market, distribute, and sell Products to the public in accordance with Scentsy's instructions and parameters. And in return, Plaintiffs were paid virtually nothing, while incurring unreimbursed personal costs to perform the work on Scentsy's behalf.

10.    For these reasons, Plaintiffs bring this action to recover unpaid wages, overtime compensation, penalties, interest, injunctive relief, other equitable remedies, damages, and

reasonable attorneys' fees and costs under the California Labor Code, Cal. Lab. Code §§ 201, 202, 203, 204, 226(a), 226.7, 226.8, 510, 512(a), 1174(d), 1194, 1197, 1197.1, 1198, 2800, 2802 and 2698 *et seq*. (the "CLC"), IWC Wage Order 4-2001 (8 Cal. Code Regs. § 11040), and California Unfair Competition Law (Cal Bus. & Prof Code §§ 17200 *et seq*.). Scentsy's conduct also violates various municipal and county codes in California, including but not limited to City of L.A. Cal. Code art. 7-7.5; County of Los Angeles Code § 8.100.040, *et seq*., San Francisco Cal. Code 12R. Additionally, Scentsy breached its contract with its Consultants when, without notice, it imposed a materially different Consultant agreement that robbed a large portion of its Consultants of a monthly commission bonus of 5% that they were previously entitled to for life, and for which Scentsy was contractually obligated to provide at least 60 day's notice of the change.

11.     Upon information and belief, Scentsy has not addressed and/or changed its unlawful practices including failing to provide complaint meal and rest periods and has continued to deprive employees of money owed to them in straight and overtime compensation. By bringing this action, Plaintiffs intend to stop this ongoing and unlawful practice and recover back wages, overtime, and commission, to which they are rightfully entitled. Plaintiffs also intend to recover the damages they suffered due to Scentsy's breach of contract.

## II.     JURISDICTION AND VENUE

12.     The monetary damages, civil penalties, restitution, and equitable relief sought by Plaintiff, the class members, and other aggrieved employees exceed the minimal jurisdiction limits of the Superior Court and will be established according to proof at trial.

13.     This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, section 10. The statutes under which this action is brought do not specify any other basis for jurisdiction.

14.     This Court has jurisdiction over all Defendants because, upon information and belief, Defendants are citizens of California, have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the California market so as to render the exercise of jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice. The acts and omissions detailed herein occurred in California.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

15.    Venue is proper in this Court because Plaintiff Wenning performed work for Defendants from her home in Crescent City, California: within Del Norte County. Defendants' acts and omissions in violation of the relevant labor statutes are thus physically tied to Plaintiff's residential address.

16.    Upon information and belief, Defendants direct and control a large workforce of "Consultants" throughout California—and have agents, employ individuals, and/or transact business throughout the State of California.

## III.    THE PARTIES

17.    Plaintiff Valerie Wenning is an individual and resident of Crescent City, California.

18.    Plaintiff Cherity Bentley is an individual and a resident of Simi Valley, California.

19.    Scentsy, Inc. is an entity incorporated under the laws of the State of Idaho, with principal places of business in Meridian, Idaho.

20.    Plaintiffs are informed and believe and based thereon allege that Heidi Thompson is, and at all times relevant hereto was, an individual residing in Eagle, Idaho, as well as Executive Co-Chair for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Heidi Thompson, in her capacity as Executive Co-Chair of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

21.    Plaintiffs are informed and believe and based thereon allege that Orville Thompson is, and at all times relevant hereto was, an individual residing in Meridian, Idaho, as well as Executive Co-Chair for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Orville Thompson, in his capacity as Executive Co-Chair of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced Labor Code

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

22.    Plaintiffs are informed and believe and based thereon allege that Dan Orchard is, and at all times relevant hereto was, an individual residing in Meridian, Idaho, as well as President and Chief Executive Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Dan Orchard, in his capacity as the President and Chief Executive Officer of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

23.    Plaintiffs are informed and believe and based thereon allege that Chuck Thompson is, and at all times relevant hereto was, an individual residing in Meridian, Idaho, as well as Chief Consultant Engagement Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Chuck Thompson in his capacity as the Chief Consultant Engagement Officer of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

24.    Plaintiffs are informed and believe and based thereon allege that Deb Bowden is, and at all times relevant hereto was, an individual residing in Eagle, Idaho, as well as Chief Consultant Development Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Deb Bowden, in her capacity as the Chief Consultant Development Officer of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1   Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial

2   Welfare Commission ("IWC") Wage Orders.

3       25.    Plaintiffs are informed and believe and based thereon allege that Josh Anderson is,

4   and at all times relevant hereto was, an individual residing in Eagle, Idaho, as well as Chief Financial

5   Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Josh

6   Anderson, in his capacity as the Chief Financial Officer of Scentsy, exercised control over the

7   wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by

8   informing employees when to report to work and what work hours should actually be recorded,

9   violated, or caused to be violated, the above-referenced and below-referenced Labor Code

10  provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare

11  Commission ("IWC") Wage Orders.

12      26.    Plaintiffs are informed and believe and based thereon allege that Mark Stastny is, and

13  at all times relevant hereto was, an individual residing in Meridian, Idaho, as well as Chief

14  Marketing Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege

15  that Mark Stastny, in his capacity as the Chief Marketing Officer of Scentsy, exercised control over

16  the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including

17  by informing employees when to report to work and what work hours should actually be recorded,

18  violated, or caused to be violated, the above-referenced and below-referenced Labor Code

19  provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare

20  Commission ("IWC") Wage Orders.

21      27.    Plaintiffs are informed and believe and based thereon allege that Paul Klassen is, and

22  at all times relevant hereto was, an individual residing in Boise, Idaho, as well as Chief Operating

23  Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Paul

24  Klassen, in his capacity as the Chief Operating Officer of Scentsy, exercised control over the wages,

25  hours and/or working conditions of Plaintiffs and other aggrieved employees, including by

26  informing employees when to report to work and what work hours should actually be recorded,

27  violated, or caused to be violated, the above-referenced and below-referenced Labor Code

28

provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

28. Plaintiffs are informed and believe and based thereon allege that Richard Steel is, and at all times relevant hereto was, an individual residing in Boise, Idaho, as well as Chief Human Resources Officer for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Richard Steel, in his capacity as the Chief Human Resources Officer of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

29. Plaintiffs are informed and believe and based thereon allege that Sam Johnson is, and at all times relevant hereto was, an individual residing in Meridian, Idaho, as well as Chief of Staff for Scentsy. Plaintiffs are further informed and believe and based thereon allege that Sam Johnson, in his capacity as the Chief of Staff of Scentsy, exercised control over the wages, hours and/or working conditions of Plaintiffs and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

30. The true names and capacities of Defendants sued as DOES 1–50, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names pursuant to section 474 of the California Code of Civil Procedure. Plaintiffs will seek leave to amend this Demand when said true names and capacities have been ascertained.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

## IV.    FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED EMPLOYEES

### A.    Scentsy Is a Successful Multilevel Marketing Company That Is Dependent on its Consultants to Engage in Social Media Marketing on Its Behalf

31.    Scentsy is a massively successful multi-level marketing company that serves both US and international markets[2] with its portfolio of fragranced consumer goods, such as scented wax bars, wax warmers, fragrance diffusers, scented oils, air purifiers, scent pods, personal care goods, cosmetics, and cleaning supplies. Founded in Utah in 2003 by Kara Egan and Colette Gunnell, Heidi and Orville Thompson purchased Scentsy in 2004 and launched it as a multi-level marketing company.[3] The Thompsons moved Scentsy's headquarters, or "Scentsy Commons," to Meridian, Idaho,[4] and the business expanded nationwide, eventually going international.

32.    Scentsy's success stems from its dependence on a massive network of Consultants. The organization's multi-level marketing, or "network marketing" or "direct sales," structure is the sole reason for Scentsy's continued profitability.

33.    But Scentsy has for decades exploited its California salesforce of Consultants by misclassifying these so-called Consultants as independent contractors rather than as employees. In knowingly and willfully misclassifying these employees, Scentsy has been able to mine free marketing and sales support from their Consultants. The cost of sales and marketing that Scentsy has thus far offloaded on its Consultants is massive: the actual figure to be revealed through discovery should this matter proceed to litigation.

34.    This is particularly egregious as Scentsy's workforce is primarily comprised of marginalized and financially insecure individuals. Scentsy targets and recruits women who are often shut out of traditional workplaces, such as those with criminal records, women who were raised in

---

[2] Rachel Garceau, *Made in Idaho: Road to Success Started Off Bumpy for Founders of Scentsy*, IDAHO NEWS 6 (May 18, 2018), https://www.kivitv.com/news/made-in-idaho/made-in-idaho-road-to-success-a-bit-bumpy-at-times-for-founders-of-scentsy.

[3] *Inside Meridian-Based Scentsy,* BOISE STATE PUBLIC RADIO - STATEIMPACT IDAHO, https://stateimpact.npr.org/idaho/tag/scentsy/ (last accessed Apr. 29, 2025).

[4] Jim Duthie, *You Can Grow It: A Visit to the Beautiful Scentsy Commons*, KTVB7 (Sept. 28, 2023), https://www.ktvb.com/article/life/home-garden/you-can-grow-it/you-can-grow-it-visit-scentsy-commons/277-7ca58b55-3b4a-4c6e-8d54-fc5721672f17.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1  or who are active in certain religious communities, women with childcare responsibilities, and

2  military wives.[5] Due to their alienation from traditional workplaces, those targeted by Scentsy tend

3  to be less familiar with their labor protections and with employment law generally. Unfortunately,

4  these women, already stretched thin energetically and financially, are less well-positioned to

5  understand their rights as workers, less likely to identify when their protections are violated, and

6  less able to seek recourse when such violations occur.

7      35.    Over the last decade, Scentsy sales have moved from in-person to primarily online.

8  This means that the lion share of Scentsy product sales would not be exempt under the AB 5 "direct

9  sales" exemption, California's Unemployment Code § 650. A confluence of factors precipitated the

10  shift of sales to the virtual realm. First and foremost, social media sites such as Facebook, X

11  (Twitter), Instagram, and TikTok have evolved into powerful marketing tools, and the adoption of

12  these social media are now ubiquitous in the direct sales of Scentsy products. Social media platforms

13  are now the predominant way MLM sellers connect with both their potential clients and their

14  community of sellers.[6] In as early as 2019, nearly half of all Americans indicated being "inundated"

15  by social media connections who flooded their "feeds" with posts attempting to sell MLM-affiliated

16  products.[7] Where once direct sales required Consultants to walk door-to-door or host "Tupperware

17  parties," now all Consultants have to do is "post their products on social media to capture the

18  attention of hundreds or thousands of people at once."[8]

19      36.    Secondly, COVID and associated lockdowns halted the ability of Consultants to

20  perform in-person sales, while also accelerating the widespread adoption of video chatting software

---

[5] "The vast majority of people who join multi-level marketing companies do not earn a profit. Those people [] also tend to be women who seek additional income to support a family or to find community." Annie Blackman, *Regulating The Reluctant: Policies That Benefit Vulnerable Participants In Multi-Level Marketing*, 25 U. PA. J.L. & SOC. CHANGE 83, 83 (2021); *see generally* Krista Marie Federico, Dissertation*, She Works Hard for No Money: Understanding Women's Participation in Multi-Level Marketing Organizations,* U. ARIZ. SCH. SOCIO. (2020).

[6] Lindsay R. Maher, *Note: Americon Dream: Social Pressures and Lackluster Regulation Allow Multi-Level Marketing Companies to Function as De Facto Pyramid Schemes*, 108 MINN. L. REV. 1587, 1622 (2024).

[7] Erika Giovanetti, *MLM Consultants Pressure Friends and Family to Overspend, and It's Straining Relationships*, LENDINGTREE (Dec. 16, 2019), https://www.lendingtree.com/debt-consolidation/survey-mlm-consultants-pressure-spending/.

[8] *Id.*

like Zoom among their potential customer bases. This led Consultants who had not yet already adapted to fully-remote sales to do so in order to adhere to lockdown policy. And since the initial draw for many Consultants was Scentsy's promise of flexible, autonomous work, it can be inferred that the flexibility that comes with online sales means that there will be no future significant, de-transition to in-person sales by Consultants.

37.    While some MLMs rely on home parties, door-to-door sales calls, and other forms of in person selling, Scentsy's model is designed so that Consultants can work online to solicit leads and recruit new Consultants. Scentsy acknowledges that its products are "sold through independent Consultants"[9] and that "all [Scentsy] orders must be placed through [Consultants'] [Personalized Website Subscriptions] or [Consultant Workstations]."[10] Scentsy relies on its Consultants to facilitate each of its sales online.

38.    Despite the pivotal role of its salesforce, Scentsy has never properly classified Consultants as employees. Rather, Scentsy adheres to a multi-level (network) marketing organization structure, in which it offers people the purported "opportunity" to develop their own business earning commission by selling Scentsy products and recruiting others to do the same, designating them as "independent contractors."

39.    However, these Consultants are not independent contractors under applicable law. Scentsy instead chose to unlawfully secure an expansive marketing and sales network for minimal to no cost. It has reaped enormous profits by deliberately avoiding paying wages and benefits to those performing the sales work that forms the backbone of Scentsy's business. Scentsy charges its Consultants for access to the instrumentalities needed to sell products, further increasing its profits and decreasing Consultants' pay, in violation of California law. The intended result is for Consultants to receive, at most, de minimis profit from their work, while providing free labor and shouldering the costs of doing business that Scentsy should be bearing.

---

[9] *About Scentsy,* SCENTSY, https://scentsy.com/about (last accessed Mar. 4, 2025).

[10] *Scentsy, Inc. Privacy Policy Notice*, SCENTSY, https://scentsy.com/form/terms-of-use (last accessed Apr. 29, 2025).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

B.    **Scentsy Consultants Are Employees**

1.    **Controlling Law**

40.    Companies like Scentsy were never supposed to be allowed to run an entire business on the backs of independent contractors. People who work in a company's core line of business are its "employees." *United States v. Silk*, 331 U.S. 704, 718 (1947).

41.    Scentsy claims an unprecedented portion of its workforce as "independent contractors." In its most recently published numbers, Scentsy disclosed that it had over 230,000 Consultants and 1,500 employees.[11] Thus, last year Scentsy claimed 99.9935% of its workforce as "independent contractors."

42.    Scentsy employees perform a variety of roles: some work as recruiting managers, copy and translation managers, commission managers, executive assistants, and warehouse operators. These workers receive special treatment from Scentsy, including benefits such as health, vision, and dental insurance; tuition reimbursement; 401(k) plans with matching contributions.[12] Moreover, Scentsy offers the employees it lays off severance based on their years of service.[13] In contrast, Scentsy retains the right to unilaterally terminate its Consultants at its discretion, and declines to offer terminated Consultants severance.

43.    But the Consultants, who make up the bulk of Scentsy's workforce, are denied even the most basic protections of federal and state labor laws. Scentsy does not pay them minimum wage; it does not pay overtime; and it does not reimburse business expenses, such as internet connections, laptops, smart phones, or post promotion over Facebook, YouTube, and Instagram. Its classification of its Consultants also deprives them of basic protections against discrimination and sexual harassment.

---

[11] *Heidi and Orville Thompson*, SCENTSY, https://scentsy.com/about/corporate-leadership/heidi-and-orville-thompson (last accessed Mar. 19, 2025).

[12] *Careers*, SCENTSY, https://storefront.scentsy.us/about/corporate-careers-and-employment (last accessed Mar. 5, 2025).

[13] On information and belief, in April 2025, Scentsy laid off approximately 116 employees at its Meridian, Idaho headquarters, as part of its ongoing restructuring. Affected employees were offered severance based on their years of service.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

44.    By design, "independent contractors" are exempted from "nearly every" labor law, but this classification was not meant to be a loophole for companies like Scentsy, whose Consultants are effectively modern day telemarketers.[14] "Historically, firms reserved the independent contractor designation for entrepreneurial individuals whose skills demanded higher pay in the open market."[15] With this in mind, "[l]egislatures rationalized excluding [independent contractors] from most employment laws because these individuals did not require the same legal protections as potentially more vulnerable, less-skilled 'employees.'"[16]

45.    Today, Scentsy preys upon many of the most vulnerable members of our society. Despite being a $40 billion industry, "the vast majority of people involved in them don't make money off of MLMs, and many people lose money."[17] In its 2024 report on MLM Income Disclosure Statements, the Federal Trade Commission ("FTC") determined that most MLMs depict an income distribution that excludes MLM participants that receive little or no income, and that income disclosure statements do not account for the expenses participants shoulder via their participation.[18]

46.    Scentsy's 2024 income disclosure statement indicates that, on average, Scentsy Consultants make little to no income. In the statement, Scentsy tracks the annual commission of 129,019 of its Consultants, and shows that for those enrolled for the full year, the median commission was $466.56, less than $40 a month.[19] This paltry sum "[does] not include any business

---

[14] Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. Rev. 1673, 1683–84 (2016).

[15] *Id.*

[16] *Id.*

[17] Emily Stewart, *$5 Jewelry And An MLM Conference Gone Wrong: Multilevel Marketing Companies Were the "Perfect" Pandemic Business*, VOX (Sept. 23, 2021), https://www.vox.com/the-goods/22688317/mlm-covid-19-pandemic-recruiting-sales-paparazzi (citing study finding that 99 percent of MLM participants lose money).

[18] Andrew Hudson, et al., *Multi-Level Marketing Income Disclosure Statements: Staff Report of the Bureau of Consumer Protection, Federal Trade Commission*, FED. TRADE COMM'N 10-12 (Sept. 4, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/mlm-ids-report.pdf.

[19] *Income Disclosure Statement*, SCENTSY (2024), https://scentsy.com/join/compensation-and-income-disclosure.

expenses Consultants may have incurred during running their businesses,"[20] such as the $15.00 per month Consultant Personal Website Fee, Starter Kits that range from $150.00 to $225.00, or the cost of purchasing newly launched products from which to create samples as sales aids.

47.     MLMs like Scentsy have grown during the COVID-19 pandemic, recruiting salespeople by promising remote work for the unemployed.[21] These are the precise individuals that legislatures meant to shield with minimum wage and other workplace protections.

48.     In recent years, state legislatures have taken action to send a clear message that most workers should be "employees."

49.     California has adopted the "ABC test" to determine whether a company, like Scentsy, has misclassified its workers as "independent contractors." Because employee status was meant to be the default, the ABC test "presumptively considers all workers to be employees and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions:

A.  that the worker is free from the control and direction of the hirer in connection with the performance of the work… *and*

B.  that the worker performs work that is outside the usual course of the hiring entity's business; *and*

C.  that the worker is customarily engaged in an independently established … business of the same nature as that involved in the work performed."

*Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903, 956–57 (2018) (emphasis in original).

### 2.     Consultants Are Not Free from Scentsy's Control

50.     To engage in online marketing work for Scentsy, the company does not require Consultants to hold any special experience, skills, license, or education level. Rather, Scentsy requires only that a prospective Consultant sign up online, pay a monthly $15.00 Consultant

---

[20] *Id.*

[21] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Consultants Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Personal Website Fee, and purchase one of the available "Starter Kits," which range in price from $150.00 to $225.00.[22]

51.    Consultants are then required to adhere to Scentsy's many policies codified in a document entitled the "Scentsy Standards: Independent Consultant Agreement," which Scentsy periodically updates, though the Consultant duties and responsibilities remained materially similar throughout the class period. An example from 2021 is attached hereto as **Exhibit C** and provides that Consultants are to be considered independent contractors. Ex. C, Ch. 6 § 1. All versions of the Independent Consultant Agreement in existence prior to the spring of 2025, including the exemplar at Exhibit C, are referred to herein as the "Primary Agreement(s)." In the spring of 2025, Scentsy published a new version of the Scentsy Standards: Independent Consultant Agreement" ("2025 Agreement"), which contains many similar terms, particularly as to the responsibilities of Consultants, but materially alters others in ways that gives Scentsy additional rights.

52.    The Primary Agreements alone range from 36 to 37 pages long. *See* Ex. C. The Primary Agreement sets out most of the requirements of the Consultants, including compliance with the Scentsy "Code of Ethics," and pairs with another codified set of instructions known as the "Compliance Guide", Ex. B. The two documents contain the various instructions and policies that Scentsy often communicates verbally and through more informal materials but nevertheless requires Consultants to follow when marketing and engaging in customer service on behalf of Scentsy.

53.    Once a prospective Consultant has enrolled, paid the membership fee and purchased a Starter Kit, they can begin selling.[23] Because Scentsy treats the Consultants as independent contractors, it does not pay them any salary, wages, or benefits. Rather, as is typical in the MLM industry, the Scentsy Compensation Plan provides for two types of compensation: (1) for sales the Consultant made to consumers, the Consultant receives a small percentage (10% to 36%) as a commission;[24] and (2) if the Consultant builds a "downline," i.e., recruits other new Consultants to market and sell Scentsy products and recruit more Consultants, then the "upline" Consultant

---

[22] *Become a Consultant*, SCENTSY, https://shoponline.scentsy.us/join (last accessed May 6, 2025).
[23] *Id.*
[24] *Id.*

receives commissions for sales made by those Consultants in their downline.[25] Scentsy also offers special "bonuses" to those Consultants who hit certain sales and recruiting metrics in various time frames.

54.    Consultants are responsible for all expenses. This includes an auto-renewing monthly Consultant Personal Website Fee of $15.00 and the minimum monthly personal purchase requirement to qualify for commission, a Starter Kit ranging in price from $150.00 to $225.00, wax bars to break up and use as samples, Scentsy brand baggies to hold these samples, and Scentsy-issued felt fabric used for sampling Scentsy fragrances. In addition, Consultants do not receive products for free or even at a discount but must purchase them at customer price from Scentsy to create promotional posts and testimonials on social media or to distribute samples. Scentsy does not reimburse Consultants for these purchases, nor for the costs of a cell phone, internet, and other routine business expenses.

55.    In the Primary Agreement, Scentsy gives itself broad rights to control Consultants and mandate conformance with its directives.

56.    Scentsy's reliance on an e-commerce platform limits Consultants' discretion and promotes online sales over in-person interactions. Consultants' Scentsy-issued websites, "Replicated Sites," are designed in a way that ensures that Consultants operate in compliance with Scentsy's marketing directives as laid out in its Primary Agreement. Because the Replicated Site is not a standalone website, but a portal by which the public can view the products on Scentsy's own website in a way that gives credit to the Consultant for the sale, the product pages and descriptions are generated entirely and solely by Scentsy, with no option for the Consultant to revise or supplement either the language or photos of the products.

---

[25] The "upline" and downline" concepts are the hallmark of the MLM structure. To illustrate, when an established Consultant, whom we will call "Amy," recruits a friend, whom we will call "Bill," to be a Consultant, Bill is in Amy's downline; and Amy is in Bill's upline. If Bill in turn recruits a new Consultant, whom we will call "Chris," then Bill has an upline (to Amy) and a downline (to Chris); the established Consultant Amy now has two levels to her downline, to Bill (first level), and Chris (second level). Should Chris then recruit someone, the established Consultant Amy would have three levels to her downline.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

57.     Consultants are also permitted one "External Website," which is a "website developed and maintained by the [respective Consultant] and officially registered with Scentsy for marketing Scentsy products and the opportunity. Ex. C, Ch. 7. External Websites must have the "sole purpose of … refer[ring] visitors to [the respective Consultant's] PWS [Replicated Website] and social networking sites that [they] use to promote Scentsy's products and opportunity, and cannot include a checkout feature." *Id*., Ch. 4 § B. Consultants may not monetize these sites, *id*., they must re-direct to Scentsy's website, *id,* and these sites are actively policed by Scentsy's compliance team, who may issue notices, suspensions, or terminations for the display of any content Scentsy's compliance team deems out of accordance with Scentsy directives. Consultants are additionally permitted to market Scentsy products using social media, given that they strictly adhere to the directives outlined in the Scentsy Compliance Guide, Ex. B at 11-12. Consultants' social media profiles are also surveilled and subject to compliance notices, suspensions, and terminations.

58.     Thus, the Consultant is in effect selling products using only Scentsy-approved marketing language and intellectual property, as required by the Primary Agreement.

59.     Scentsy sets the prices online and does not permit adjustments, nor is there a way for a Consultant to allow a customer to get a discount, receive a free gift, make a donation, or use any other offer that is not available on Scentsy's main platforms and to all Scentsy customers. This significantly limits Consultants' marketing discretion.

60.     Scentsy also restricts Consultants from using any platform other than Scentsy's website to make online sales; in other words, they cannot sell the products directly to consumers on Facebook Marketplace, eBay, Amazon, or similar sites. By making the Replicated Sites available and performing the back-end work, Consultants would be less likely to seek out other e-commerce platforms to sell the products even if they were permitted.

### 3.     Consultants' Work Is Not Outside Scentsy's "Usual Course of Business"

61.     Scentsy views the work of the Consultants to market the products online as central to its business model. The primary benefit to Scentsy from the Consultants' work is the way in which they drive people to Scentsy's website and fuel engagement with the brand. Scentsy gets increased visibility on social media, enabling it to compete in a saturated lifestyle and consumer goods market

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

more cheaply. For much the same reason that brands turn to influencers, Scentsy understands that social media posts from friends may be more persuasive in driving interest and generating paying customers than a paid advertisement.

### 4. Scentsy Cannot Meet Its Burden To Show That Consultants Are "Customarily Engaged" in a Separate Business

62.    Scentsy cannot meet its burden to show that Consultants are "customarily engaged" in an independently established sales and marketing business. Instead, most Consultants are recruited regardless of their skill or experience, only perform sales and marketing for Scentsy (using Scentsy's approved platforms), and maintain no separate sales or marketing business.

63.    Consultants are not required to have any background in the marketing or sales of consumer goods prior to becoming a Consultant. Consultants are not required to have any licensure or meet any educational requirements, either. For example, they do not to have any schooling, training, or prior employment in fields relating to the subject matter of Scentsy. Nor does Scentsy require that they have schooling, training, or prior employment in marketing, sales, or general business. Instead, Scentsy only requires that a prospective Consultant complete a short application asking for basic personal information, pay a monthly $15.00 website fee, purchase a Starter Kit, and meet their monthly sales quota. In fact, most Consultants have little to no prior relevant experience or training.

64.    Most Consultants have never owned or operated their own separate sales business outside of Scentsy. And most Consultants do not maintain any registered or incorporated sales or marketing business, for their work with Scentsy or otherwise. Consultants generally do not hold themselves out to others as sales or marketing professionals or maintain any office or business address.

65.    Rather than rely on Consultants' own business acumen or sales experience to market products, Scentsy provides nearly every instrumentality of Consultants' sales and marketing work. These include the Consultant Workstation (a password-protected website which includes a tool for Consultants to send messages to customers and their downline Consultants, as well as a gallery of approved images and video clips), the Replicated Site (the content of which is provided by Scentsy

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    and does not allow deviation from the standard template), the Scentsy Connect app, and Scentsy-

2    issued scripts and graphics for use in marketing.

3    66.    Ultimately, Scentsy intends for Consultants to see Scentsy as an employer, not as

4    client. In other words, regardless of whether a Consultant maintains any kind of independent

5    business, Scentsy's policies and mandated instrumentalities of work make it so the Consultant

6    responsibilities are not those that are of the sort that would be performed by an independent and

7    trained professional. For example, Scentsy requires Consultants to identify themselves by their

8    names and as "Independent Scentsy Consultants" on social media profiles and posts, and on

9    Consultants' External Websites, forbidding the use of an alias. Ex. C, Ch. 3 § 2. The expectation is

10   that the Consultants are using Scentsy's brand to sell, not their own business's identity. Likewise,

11   Scentsy's policies promoting sales through the Replicated Sites, restrictions on using other websites

12   as a point of sale, and limitations on where the products can physically be sold effectively prevent

13   Consultants from integrating the sale of Scentsy products into any pre-existing business. And

14   Scentsy prohibits Consultants from using its platforms to promote other businesses, including any

15   other multi-level marketing companies.

16   67.    Similarly, those experienced in social media marketing are not allowed to use the

17   kinds of tools relied upon by professionals in the field; Scentsy forbids Consultants from creating

18   or using their own graphics without explicit approval from Scentsy. People with digital marketing

19   experience cannot leverage their skills because Scentsy does not provide access to data collected

20   from visitors to Consultants' Replicated Website, nor the ability to track them and target ads to

21   them. Instead, Scentsy designs the overall social media advertising campaign, and supplies the

22   Consultants with hashtags, scripts, promotional photos and video clips, and other strategic

23   advertising directives for the Consultants to use to sell Scentsy's products on social media.

24   68.    Further, Scentsy actively limits Consultants' ability to engage in sales or marketing

25   opportunities outside Scentsy. For example, Scentsy Consultants are "prohibited from leveraging

26   Scentsy assets, websites, events or the network of Scentsy Consultants to sell anything other than

27   Scentsy." Ex. C, Ch. 5. Scentsy's compliance team surveils all the instrumentalities that Consultants

28   rely on for their marketing and sales of Scentsy products, issuing notices, suspensions, and

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

terminations for co-marketing, cross-marketing, or cross-promoting Scentsy with any other venture. *Id*.

### 5.    Scentsy Consultants Are Not "Direct Sellers."

69.    Despite classifying the Consultants as Independent Contractors, they are employees under California law. As set forth below, while some MLM workers might meet the narrow statutory exemption for those employed in "direct sales," Consultants do not.

#### i.    *Background on MLMs and the Direct Sales Exemption.*

70.    For many years, the MLM industry has enjoyed notoriety for its ability to carve out loopholes from federal and state employment laws, permitting MLMs to treat its sales personnel as independent contractors. These regulations were enacted in the 1970s and 1980s, and in California, the exemption describes a different job than what Consultants perform.

71.    When AB 5 was passed in 2019, it codified the opinion in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles County*, 4 Cal. 5th 903 (2018), in which it set forth a new test for misclassification (the "Dynamex Test"). When the bill was being debated, many in the MLM industry recognized that the Dynamex Test would require them to classify their workers as employees. The Direct Selling Association ("DSA"), the industry lobbying group, pushed for an exemption. As a result of those efforts, AB 5 exempts from the Dynamex Test any salesperson "described in Section 650 of the Unemployment Insurance Code, so long as the conditions for exclusion from employment under that section are met." ("Direct Sales Exemption") For such workers who fall within the exemption, the old common law test (rather than the ABC Test) would govern the question of employee status.

72.    For an entity to be covered under the Direct Sales Exemption, the hiring entity must show that the work satisfies all three criteria set forth in the statute, namely that (a) the worker performs one of two specific types of work; (b) the worker's compensation is directly tied to sales or output, and not hours worked; and (c) the worker and business have an agreement that the worker will be treated as a contractor for tax purposes. If all three criteria are not met, then the exemption does not apply, and if the worker otherwise meets the Dynamex Test, they are misclassified. While the third of these criteria—services performed pursuant to a contract identifying the person as an

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    independent contractor—is only facially met, and even if it were an enforceable contract, that factor

2    is not dispositive. As discussed below, the Consultant job does not satisfy the other criteria.

3                  *ii.*    _Scentsy Consultants Do Not Perform the Jobs Identified in the Direct Sales_
         _Exemption._

4

5         73.    First, for the Direct Sales Exemption to apply, the salesperson must be performing

6    one of two narrowly defined jobs. Specifically, the Exemption requires that one be "engaged in the

7    trade or business of primarily inperson [sic] demonstration and sales presentation of consumer

8    products, including services or other intangibles, in the home or sales to any buyer on a buy-sell

9    basis, a deposit-commission basis, or any similar basis, for resale by the buyer or any other person

10   in the home or otherwise than from a retail or wholesale establishment." In other words, section (a)

11   of the Direct Sales Exemption is best understood as identifying two specific categories of direct

12   sales jobs, **Primarily In Person Consumer Sales Work**, and **Wholesale/Resale Work**, that could

13   trigger the applicability of the Direct Sales Exemptions. The Consultant does not fall under either

14   of these categories.

15        74.    **Scentsy Consultants Are Not Engaged Primarily in In-Person Consumer Sales**

16   **Work**. This job category covers those who are "engaged in the trade or business of primarily

17   inperson [sic] demonstration and sales presentation of consumer products, including services or

18   other intangibles, in the home." Thus, the exemption is limited to those who are *primarily* selling

19   consumer products *in person* and *in the home*. These terms are significant, as they do not appear in

20   the analogous job category of "direct sellers" under a later federal statute. *See* 26 U.S.C. §

21   3508(b)(2)(ii). Thus, the California exemption applies narrowly to jobs like door-to-door

22   salespersons, or the direct sellers who work almost exclusively through the home party circuit, i.e.,

23   people who sell consumer products by meeting with other consumers in their homes.

24        75.    As discussed throughout, Consultants do not "primarily" sell "in person." Moreover,

25   to the extent any Consultant in the Scentsy network was primarily conducting "in person" sales after

26   the purported Scentsy "digitization" the COVID pandemic would have pushed more sales online.

27        76.    **Scentsy Consultants are not engaged in Wholesale/Resale Work.** This job category,

28   which also has a federal parallel, 26 U.S.C. § 3508(b)(2)(i), covers those are engaged in:

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

a)   "sales to any buyer"

b)   "on a buy-sell basis, a deposit-commission basis, or any similar basis,"

c)   "for resale by the buyer or any other person", and

d)   "in the home or otherwise than from a retail or wholesale establishment."

While California law does not define the terms buy-sell or deposit-commission in [b], federal law does. The term "buy-sell basis" is one in which one buys the product to sell the product, and gets paid for selling the product with the spread between the purchase price and the resale price, and term "deposit-commission basis" applies where the buyer keeps as commission for a sale of a product the deposit received from the buyer. *See* 26 U.S.C. 6041A(b)(2)(A) & (B).

77.    The "Wholesale/Resale Work" is even more narrow than "In Person Home Sales Work," and does not apply to Scentsy. Rather, Scentsy's Primary Agreement requires that Consultants sell only to themselves or to retail customers. Nowhere in the Primary Agreement or in Scentsy's public materials does it state that compensation is on a buy-sell or deposit-commission basis.

78.    To illustrate what is meant by "Wholesale/Resale Work," a hypothetical upline Consultant Sue would be performing this work if [a] Sue was selling Scentsy products to her downline Consultant Bob [c] for Bob to resell, not to keep for his own use; and [b] Sue was compensating Bob for his resale services by permitting Bob to keep the difference between the price he paid to Sue and the product's selling price or by permitting Bob to keep the deposit he acquired. Consultants do not work in this way, selling products to Consultants for Consultants to re-sell. If Bob directs a lead to his Replicated Site, and the lead purchases a product from Scentsy, both he and his upline Consultant (e.g., Sue) would receive a commission for sales from Scentsy. But as to Sue, [a] is not met because Sue did not sell the products to Bob. Because Bob acquired the products from Scentsy to sell at retail, not to someone to re-sell, [a] and [c] are not met. As to both, [b] is not met, because neither sold the product on those terms. Rather, Scentsy takes the full payment at the point of sale and sends the product directly to the consumer, and then separately pays the Consultant.

79.    ***The job descriptions in the Direct Sales Exemption predate significant changes to how MLMs now operate.*** By way of background, these two categories of jobs outlined in the Direct

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Sales Exemption were how MLMs organized at the time the Direct Sales Exemption was enacted. In the 1970s and 1980s, downline sellers hosted parties, traveled door to door, had booths at local fairs, or visited friends and family in their homes to hand out samples, catalogs, and sales sheets. They took orders and payment directly from the customer. Once the seller had enough orders, the seller placed the order with the company, received the shipment from the company, and then met with the customer again in person to deliver the product and if necessary, collect any further payment that might be due. The direct seller engaged with consumers both directly and personally; the consumers had little to no interaction with the company.

80.     In some instances, instead of placing the order with the company, the seller performing "In Person Home Sales" would place the order with the person in their "upline," who was engaged in "Wholesale/Resale Work." The upline seller acquired products from the company, and sold them to the downline "In Person Home Sales" worker on a buy-sell or commission deposit basis for them to sell to end consumers (or to their downlines). The seller was able to do "Wholesale/Resale Work" because at the time, MLMs permitted direct sellers to fulfill their sales quotas by either selling the product to retail consumers or selling it to downline sellers.

81.     Since the Direct Sales Exemption was enacted, various changes in the MLM industry occurred to move away from this model. Most notably is the fact that over the last few decades, MLMs have been forced to make changes to their operations in response to regulatory actions and civil lawsuits by private litigants to enforce anti-pyramid scheme laws. Courts and regulators have made clear that to avoid violating criminal and civil pyramid scheme laws, MLMs needed to conduct operations so as to ensure that real, meaningful sales were happening directly to consumers—instead of primarily to sellers' own downlines. *See, e.g.*, *Webster v. Omnitrition Int'l*, 79 F.3d 776, 782 (9th Cir. 1996). It was not enough to simply have a policy that sales should be at retail; the law has evolved so as to require MLMs to enforce that policy and to demonstrate its effectiveness at ensuring participants were not merely stockpiling inventory and seeking to recoup losses by recruiting new sellers to buy the product from them.

82.     These legal developments have prompted two important changes. First, because MLMs must ensure retail sales are occurring, few if any MLMs permit sellers to perform

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

"Wholesale/Resale Work." Certainly, Scentsy does not. Second, the work undertaken by MLMs to enforce policies as to sales at retail results in them exercising far more control than they might have decades ago.

83.     Furthermore, by implementing platforms such as the Replicated Site, Scentsy can better oversee Consultants in their work to ensure they are not engaging in activities that could run afoul of anti-pyramid scheme laws. Scentsy can oversee all retail sales, given the vast majority occur on its website and on public social media pages. While this control may protect Consultants from being a victim of one kind of legal violation, they also remove much of the discretion that other independent MLM contractors had.

        *iii.*    *Scentsy's Modern E-Commerce Business Is Unlike Past and Present Direct Sales Companies.*

84.     The Direct Sales Exemption and its inclusion in AB 5 was based on the MLM industry's claim that it is needed to ensure the industry can continue to offer people the opportunity to create and run their own businesses. Some MLM businesses do run operations that are predominately based on around in-person sales, promoting home parties and sales at community events, like Parent Teacher Association meetings or similar. Some do not allow consumers to buy products via a company website or they use pricing and purchasing policies that give the seller more control. In the primarily face-to-face, in-person sales context, the direct line between a person's effort and a closed sale may still be one that can be drawn and may allow for the kind of independent business operations contemplated by the statute.

85.     Scentsy's operations, however, are a stark departure. It is one of the few MLM businesses offering a video streaming service as a flagship product. And the way in which it operates its platforms, including the Replicated Sites, eliminates for the Consultant nearly all the work associated with operating a business, as compared to MLMs of the past, and of some in the present. At the same time, by removing many of the functions performed by sellers in the past, Consultants with expertise, skills, or a willingness to invest in certain areas are unlikely to realize a material change in their earnings prospects.

86.    For example, the use of Replicated Sites means that skills or investment in inventory management or distribution processes are not necessary, nor will they have a material impact on a Consultant's outcome. When customers place orders on the Replicated Sites, Scentsy fulfills them. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, Consultants do not need to plan to have products on hand or collect bulk orders.

87.    Similarly, expertise or support in accounting, finance, economics or pricing will not impact a Consultant's outcome, because Consultants are not able to alter prices at which the products are sold on their Replicated Site and must sell them at the rate that Scentsy has determined will cover Scentsy's expenses, regardless of whether the Consultant's compensation is enough to cover the Consultant's expenses. Scentsy calculates, collects, and remits sales taxes, and Consultants do not need nor would benefit from experience in that area. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, Scentsy does not give a larger discount or increase the percentage basis for a commission if a Consultant orders a larger amount of products for their customers.

88.    Scentsy also pays the Consultant's upline and downline and determines any compensation owed to them, and thus, a Consultant does not negotiate or set anyone else's rates of pay. Scentsy handles the payment interface, and thus Consultants do not need expertise in electronic payments, data security and privacy, credit card processing regulations, or similar.

### 6.    The Terms and Conditions in the Consultant Agreements are Unconscionable, Unfair, and Unlawful.

89.    The Primary Agreement between Scentsy and Consultants are a tool by Scentsy to exert control while maximizing Scentsy's profits. The Consultant opportunity is a take-it-or-leave it deal, with no opportunity for negotiation. And many Consultants discover that the arrangement is one in which they will spend extraordinary amounts of time and money promoting the company with little payoff.[26] Indeed, the effect of the Agreement, when considered in tandem with Scentsy's

---

[26] *See* Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Consultants Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/; Emily Stewart, *$5 Jewelry And An MLM Conference Gone Wrong: Multilevel Marketing Companies Were the*

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

other business practices, grossly restricts Consultants' ability to profit from their work advertising sales, and may cause Consultants to turn attention to recruiting more Consultants into a futile business endeavor.

90.     Indeed, MLMs like Scentsy have been criticized for the fact that few of the sellers manage to profit. At least one study concluded that 99% of MLM participants end up in the red;[27] another found that only 25% earned a profit.[28] Scentsy's Consultants are no exception. Scentsy's own numbers, which likely intentionally obscure that the majority of Consultants fail to break even as explained *supra* in Paragraphs 45 and 46, are consistent with this low rate of success: their Consultants rarely make any money.

91.     Moreover, Scentsy has structured its business operations, Primary Agreements, and Compliance Guide to benefit from the addition of more Consultants, while Consultants lose. Scentsy benefits when tens of thousands are active on social media but incurs no other expense unless the Consultant generates a sale. While Scentsy benefits from an oversaturation of Consultants, the individual Consultants only have more competitors and a harder time setting themselves apart. And nowhere in the Primary Agreement does Scentsy promise to limit the number of Consultants retained in any way.

92.     Given that Consultants must compete with Scentsy and other Consultants for retail sales under such oppressive and onerous terms, it is no surprise that the overwhelming majority never receive commission or struggle to break even. But because Consultants receive commission from the retail sales made by any Consultants they recruit, Scentsy's own income disclosures indicate that those who advance to higher levels through recruiting more Consultants on average earn more money. Thus, Consultants have a financial incentive to advertise the opportunity to work with Scentsy under these unfair, unconscionable, and oppressive terms. Those new Consultants in

---

*"Perfect" Pandemic Business*, VOX (Sept. 23, 2021), https://www.vox.com/the-goods/22688317/mlm-covid-19-pandemic-recruiting-sales-paparazzi (citing study finding that 99% of MLM participants lose money).

[27] *Id.*

[28] *What is Multilevel Marketing (MLM)?*, AARP FOUNDATION, https://www.aarp.org/aarp-foundation/our-work/income/multilevel-marketing/ (last accessed Oct. 30, 2024).

turn will pay Scentsy various fees discussed herein, buy merchandise from Scentsy, promote Scentsy on social media, be subject to the same restrictions on selling as those who recruited them, and like those before them, find profiting from selling to be futile and turn to recruiting.

**C.    Scentsy's Misclassification of Plaintiff and Consultants Was Willful.**

93.    Scentsy's decision to misclassify the Consultants as independent contractors was willful and intentional.

94.    *First,* Scentsy is a highly sophisticated, large company, and its management and its legal team would be exposed to news about changes in California law with respect to misclassification.

95.    *Second,* as detailed above, Scentsy's Agreements and Compliance Guide, as well as other materials and communications to Consultants, set forth various rules and policies. Scentsy knew and intended for Consultants to conform to these rules and policies and ensured adherence through its own platforms and other instrumentalities.

96.    *Third,* Scentsy knows and depends on the Consultants and even the highest levels of the company understand that the Consultants play an essential role in Scentsy's growth and business model. The management team, including the CEO and CFO, not only understand the essential role the Consultants play, but know they are classified as independent contractors, as evidenced by their decision to operate the company as an MLM. Thus, the decision was not a singular decision by a low-level employee, but a conscious and knowing choice endorsed by the highest levels of the Company.

97.    *Fourth,* Scentsy further knows and understands as an MLM, few workers will make money under a commission structure and repeatedly states in publicly accessible documents that its Consultants only get paid if they make a sale, no matter how many hours they worked promoting Scentsy. Indeed, the commission structure represents a significant cost savings over the payment of hourly wages. Scentsy is aware that it is receiving inexpensive, commission-based work from its Consultants—it intentionally structured the program in that way.

98.    *Fifth,* Scentsy knew that its Consultants were not engaged in either type of work protected under the Direct Sales Exemption. It does not use terms like "buy-sell" or "deposit-

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

commission" in its compensation documents or Agreements. It also knows that its Consultants engage primarily in social media marketing on its behalf, and are rarely, if ever, engaging in person sales or hosting parties in others' homes, particularly during and since the COVD pandemic. And it designs platforms, such as the Scentsy Workstation, Scentsy Connect App, and Replicated Sites to facilitate online sales and marketing.

99.     **Sixth,** Scentsy knew the Direct Sales Exemption was enacted years ago, and there was no guarantee that all MLMs could enjoy its protection. Rather, Scentsy has been an MLM since at least 2004 and thus, should have or did know that the classification of MLM workers has for years been one of the most critical legal and policy issues for the industry.

100.    Specifically, Scentsy is a member of the Direct Selling Association ("DSA"), an MLM lobbying association, which disseminates updates about its activities to its members, including its lobbying efforts for exemptions to wage and hour laws for its members. For years, it has issued warnings and information to its members, advising them to review their agreements to ensure conformity.

101.    For example, in 2018, the DSA filed an amicus brief in a misclassification case pending before the Oregon Supreme Court. There, the court determined that the MLM had misclassified its sales personnel as independent contractors. *See ACN Opportunity, LLC v. Emp't Dep't*, 362 Or. 824 (2018). The decision was based in part on the fact that the statute exempted sales "in the home," and the legislative history indicated that this exemption was narrowly tailored to apply to things like Tupperware parties. Notably, the concurrence made clear that the direct sales laws on the books reflect outdated direct selling practices and may not reach many modern MLMs.

102.    It is hard to imagine that Scentsy would not have learned of a decision by a neighboring state supreme court, particularly given the decision's significance to its industry, the role played by the DSA, and the timing in the wake of the *Dynamex* decision locally. And shortly after its passage, the DSA announced the creation of an "Independent Contractor Initiative" to combat the consequences of that decision and ensure stronger state laws.[29]

---

[29] *See* Jeff Babener, *Op-Ed by Jeff Babener in the World of Direct Selling: DSA Launches Independent Contractor Initiative*, Direct Selling Association (Sept. 10, 2018),

**D.**   **Scentsy Breaches the Terms of its Compensation Plan in the Primary Agreements.**

103.   Under Scentsy's compensation plan in the Primary Agreements, Consultants typically start at the "Essential" status level, where they receive 20% commission on sales. *See, e.g.,* Ex. A, Ch. 2 § 1; Ex. B, Ch. 2 § 1; Ex. C, 2 § 1. Once a Consultant hits a certain sales milestone, selling 1,000 Personal Retail Volume ("PRV"), roughly equivalent to $ 1,000 to $2,000 depending on the products sold, they graduate to "Certified," guaranteeing them 25% commission per product sold, for their entire duration of their tenure at Scentsy. PRV is an internal points system used by Scentsy to value products for purposes of Consultant compensation. For many products, PRV is the equivalent of the retail price of the product (e.g., a $50 product at retail is worth 50 PRV), but for certain products, such as subscriptions or specially licensed products, or retail sales involving promotional coupons, Consultants get a reduced PRV, depending on the product (e.g., a $50 product could be worth 25 or 40 PRV).

104.   While Scentsy wrote the Primary Agreements to give itself the unilateral right to modify it, at all times, Scentsy promised Consultants that it would provide 60 days advance notice of any changes to the plan through the Scentsy Workstations. *See, e.g.,* Ex C, Ch. 6 § 4.

105.   On or around March 13, 2025, Scentsy locked all its Consultants out of the Scentsy Workstation. The first time a Consultant attempted to sign on after March 13, 2025, they were displayed a newly drafted version of the 2025 Agreement, dated April 1, 2025. Ex. D. While this screen was displayed, Consultants could not access any Workstation features. Consultants could only access the 2025 Agreement, and would remain locked out of the Workstation until they either accepted or to declined the 2025 Agreement. Consultants who declined to accept the 2025 Agreement would be terminated.

106.   The 2025 Agreement materially changed the terms of the "Certified" benefit in the Agreement. Under the new terms, Scentsy added a new requirement to receive the 25% commission. Not only did Consultants have to hit a lifetime 1,000 PRV and reach the Certified level, but they

https://www.dsa.org/events/news/individual-press-release/op-ed-by-jeff-babener-in-the-world-of-direct-selling-dsa-launches-independent-contractor-initiative.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

would have to sell a PRV of 250 (worth $250-$500 in retail sales) in any given month to get 25%. Ex. D, Ch. 2 § 1. Consultants at the Certified level would only receive 20% commission if they sold less than 250 PRV in a given month. Scentsy also removed the term in the Primary Agreement that obligated Scentsy to provide 60 day notice via the Workstations in the event it changed the compensation plan.

107.    Consultants who took time to evaluate the 2025 Agreement were locked out from the Workstation until they accepted the new terms. During this time, they were denied access to the Workstation functionality on which they relied to perform their role as Consultants. Thus, until the Consultants accepted the 2025 Agreement, they were unable to attend to their sales and marketing work, potentially losing sales. Because Scentsy also stored the Consultant tax documents on the Workstation, Consultants had to accept the terms of the 2025 Agreement to access their 1099s to file their taxes on time. While Scentsy claimed that Consultants could contact the legal department to obtain their 1099s, those Consultants would have to wait many days to get a response, causing delays that could interfere with a Consultant's ability to timely file their taxes.

108.    Consultants that did not select either accept or decline for a substantial period were still charged the monthly Personal Website Fee of $15.00, meaning they were charged for a software product they could not and did not use. Scentsy did not provide Consultants who had been locked out the opportunity to negotiate any terms, presenting a true take-it-or-leave-it scenario, leaving Consultants no meaningful choice in negotiating or declining the 2025 Agreement.

109.    While the 2025 Agreement was dated April 1, 2025, and Scentsy began displaying it to Consultants via their Workstation in or around March 13, 2025, Consultants would learn at the end of the month that the new compensation policy actually went into effect on March 1, 2025. Thus, a Consultant at the Certified level, who performed work and received sales in the first two weeks of March, and was forced to acquiesce to the April 1, 2025 Agreement on or after March 13, would only receive the 25% commission required by the Primary Agreement unless they also satisfied the new terms in the 2025 Agreement and hit the required PRV.

110.    As the compensation change went into effect on March 1, under the terms of the Primary Agreement, Scentsy was required to provide notice to Consultants through the

Workstations by January 1. None of the Consultants were given 60 days' notice of the change to the compensation policy, but instead, received notice weeks after the change was implemented via duress. Consultants were unable to do their work or access tax documents unless they agreed, and those Consultants who refused to agree would be terminated, entitling them to nothing. Consultants who did acquiesce would be subject to lower pay that they were promised for life should their monthly PRV slip below 250, a rule that would apply to sales already made during the month, and they would lose the right to advance notice of compensation changes going forward.

**E.** **Scentsy's Misclassification of Consultants and Unfair Business Practices Harm the California Public.**

111.    Scentsy's misclassification of its workers and unfair and unconscionable business model threatens the general public. Because Scentsy has no incentive to stop these practices, a public injunction is necessary to stop these practices.

**1.** **Scentsy Uses Widespread Advertising Practices Directed at the General Public to Recruit New Consultants.**

112.    Scentsy has eschewed traditional recruiting practices in lieu of widespread advertising. Because of how Scentsy recruits, nearly everyone in the state of California is likely to be targeted for recruiting and engagement in Scentsy's unfair and unlawful business model.

113.    Rather than market job opportunities to job seekers meeting certain criteria, Scentsy uses its Consultants to promote the Consultant opportunities in the same way they advertise its products. Scentsy has set up its compensation structure and business model to incentivize Consultants to turn to recruiting, and those Consultants in turn will promote the opportunity to their customers, as well as their family and friends. Thus, the public does not need to be affirmatively seeking out job opportunities; merely buying a routine consumer good or having a friend or family member working as a Consultant may subject them to recruiting messaging, and by extension, could lead them to accept the Agreement and become a Consultant.

114.    Moreover, Scentsy's reliance on its existing Consultant network to advertise the Consulting opportunity is likely to cause the message to reach the general public at large, as its network is enormous. Scentsy boasts that it has as many as 300,000 Consultants globally, and likely

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

more than 100,000 in the United States.[30] While the MLM industry generally saw massive upticks in enrollment numbers during the COVID-19 pandemic, and numbers have declined since then, there are likely thousands still in California, and numbers could surge under another pandemic or major economic downturn. Consultants need not respect geographic boundaries when advertising the Consultant opportunity, and thus, any member of the California public who either personally knows a Consultant or follows one on social media, regardless of where the Consultant lives, is likely to receive messages about the Consultant opportunity.

115.   Because of the financial incentives those Consultants receive, members of the public may sometimes repeatedly and consistently receive advertising about the Consultant opportunity over weeks or months at a time, and perhaps from multiple Consultants. Indeed, each newly recruited Consultant presents the risk of an exponential increase of Consultants. Consultants can maintain their status and receive additional compensation based on the sales volume of the downline Consultants that they recruited. The more Consultants recruited into their downline, the more likely it is that they will be able to generate more income.

116.   Because Consultants are incentivized to aggressively recruit new Consultants, and Scentsy considers every customer to be a potential Consultant, California's residents are vulnerable to long-term consequences of Scentsy's rampant misclassification. Notably, Scentsy is not a selective employer; it requires little in the way of experience or other criteria. The overwhelming majority of adults in the state of California are likely qualified for the job, and millions of people in the state may seek out this opportunity. Indeed, it is estimated that one in every thirteen Americans will participate in an MLM at some point in their lifetimes.[31] This could translate into hundreds of thousands of Californians, if not millions of Californians, who are at risk of being recruited into an illegal and unfair working arrangement.

---

[30] Scentsy discloses that it has "300,000+ [I]ndependent Consultants who promote and sell Scentsy products around the world" on its "Careers" page, on the Scentsy website. *Careers*, SCENTSY, https://scentsy.com/about/corporate-careers-and-employment (last accessed Apr. 30, 2025).

[31] Marguerite DeLiema, et al., *AARP Study of Multilevel Marketing: Profiling Participants and their Experiences in Direct Sales*, AARP FOUNDATION (2018), at 13, https://www.aarp.org/content/dam/aarp/aarp_foundation/2018/pdf/AARP%20Foundation%20ML M%20Research%20Study%20Report%2010.8.18.pdf.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

     **2.**       **Scentsy's Unfair and Unlawful Conduct Harms California In Other Ways.**

117.    Beyond recruitment, Scentsy's misclassification of their Consultants harms Californians both economically and socially. When Consultants lose money and accumulate credit card debt, they and their families are harmed by the siphoning away of their uncompensated time and lost money on business expenses. This results in them and their families having fewer resources to invest in legitimate businesses and less time to spend working for real, guaranteed wages. And instead of the opportunity being a "side hustle" that allows them to pay off mortgages or student loan debt, cover costs of childcare, or otherwise advance financially, the loss of money from Independent Consulting could cause them more economic hardship.

118.    This public harm intensifies during periods of crisis. It is well-documented that MLMs, including Scentsy, profited from greater recruitment of participants during the COVID-19 pandemic.[32] Scentsy expects the same profit from future crises, such as financial recessions, because it recruits new Consultants under the guise that they will be able to grow their own business with a sustainable income. Scentsy siphons potential workers away from legitimate opportunities with the promises of building a personal business, when these individuals are under Scentsy's control with none of the benefits of proper classification, and hurting California families.

119.    Scentsy's practices also harm competitors, such as legitimate companies in the lifestyle and consumer goods space, who must and do pay wages and benefits at prevailing market rates to market and sell their products. By misclassifying its workers, and paying them only for certain sales, Scentsy incurs lower expenses, giving them a competitive advantage over other market participants.

120.    The California Legislature specifically considered harms like these in passing AB-5. The legislature recognized "harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and

---

[32] *See* Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Consultants Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance" and that "the misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality." Scentsy's continued misclassification of California workers will exacerbate all these harms to the California public.

121.    Absent an injunction protecting the public from the negative impacts of Defendants' illegal activities, including by and through their officers and/or entities in their control, the California public remains at risk from Scentsy's deceptive recruitment strategies and the economic and social harms created by their unlawful practices.

**F.    Plaintiff's Experiences as a Scentsy Consultant**

    **1.    Plaintiff Valerie Wenning**

122.    Plaintiff Valerie Wenning enrolled as a Scentsy Consultant on around September 30, 2016 and remains active.

123.    When she signed up in 2016, Scentsy required Plaintiff Wenning to adhere to its many rules and policies, as well as its compensation plan, codified in the form of the Primary Agreement and the Compliance Guide. Plaintiff Wenning was not engaged in an independently established trade, occupation, or business as a sales professional and had limited sales experience.

124.    Around the time she signed up, Plaintiff Wenning filled out her profile using the Scentsy Workstation.

125.    Scentsy also provided Plaintiff Wenning with a personalized Scentsy website URL for her Replicated Website and instructed her to provide it to prospective customers.

126.    At no time has Plaintiff Wenning been instructed to focus on in-person sales. As a general matter, Plaintiff Wenning understands from communications, directives, and practices of Scentsy that sales efforts are to be predominately online.

127.    In the course of her tenure as a Consultant on behalf of Scentsy, Plaintiff Wenning predominately markets Scentsy products on various social media platforms, including Facebook. To carry out this marketing work, Plaintiff Wenning performs the following tasks:

a)  Purchasing, studying, and testing Scentsy products;

b)  Using the Scentsy Connect App and the Scentsy Workstation to keep up with Scentsy trainings and new product launches;

c)  Purchasing and studying Scentsy catalogues so she can effectively position newly released Scentsy products;

d)  Posting on her social media pages about Scentsy products, which involves brainstorming content, drafting and editing text, and selecting Scentsy-issued photographs for each post, as well as incorporating Scentsy-approved messaging for many, if not all, of her posts;

e)  Developing and following up with Scentsy sales leads;

f)  Regularly monitoring the Scentsy Website, Connect App, and Workstation as well as her own social media pages to engage further with customers, and replying to any direct messages from interested customers;

g)  Hosting online private groups via Plaintiff Wenning's social media pages;

h)  Facilitating labor-intensive Scentsy "parties," or livestreamed demonstrations via Facebook, which last several hours each time and require proactively recruiting attendees, demonstrating Scentsy products, answering questions during the livestream posed by potential customers, and following up with all attendees;

i)  Putting together Scentsy "baskets," or personalized bundles of newly released products for specific customers;

j)  Purchasing Scentsy-issued felt swatches which she then scents using Scentsy fragrances and distributes as samples to potential customers;

k)  Purchasing Scentsy scent bars, and breaking them into smaller pieces from which to make samples, before bagging these samples in Scentsy-issued baggies and distributing them to potential customers;

l)  Purchasing Scentsy-issued scratch-and-sniff stickers to provide as samples to potential customers;

m)  Creating sales aids such as business cards to distribute to potential customers;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

n)  Assisting customers in facilitating returns through Scentsy upon their receipt of damaged goods; and,

o)  Evaluating customer's needs, lifestyle, and goals to put together customized Scentsy product bundles for these customers.

128.  Plaintiff Wenning performed all these tasks regularly throughout her tenure. For most of her time as a Consultant, Plaintiff Wenning would typically spend about seventy-five (75) hours a week, daily working for periods of eight (8) to twelve (12) hours. Plaintiff performed these activities nearly every day. Starting in January of 2025, Plaintiff Wenning reduced her hours.

129.  Plaintiff Wenning rarely, if ever, sells to customers in-person, and her advertising and messaging is done online.

130.  Plaintiff Wenning, like all Consultants, works under Scentsy's pervasive control and direction. Selling Scentsy products—the main responsibility of Consultants—is work that is precisely in line with Scentsy's usual course of business.

131.  Plaintiff Wenning has paid for the following out-of-pocket work-related expenses throughout her tenure:

a)  The $15.00 monthly Consultant Personal Website Fee;

b)  A starter kit;

c)  A multitude of various scent bars, which she broken into smaller pieces and distributed as samples;

d)  Scentsy-issued baggies to hold these samples;

e)  Scentsy-issued felt fabric swatches to scent using Scentsy fragrance and distribute as samples;

f)  Many different Scentsy-issued product catalogues;

g)  Scentsy-issued order forms;

h)  Scentsy-issued scent warmers every month;

i)  Seasonally released product kits;

j)  Scentsy-issued scratch-and-sniff stickers;

k)  Business cards ordered through Vistaprint;

l)   A ticket to virtually attend Scentsy's 2024 Family Reunion event;

m)  Travel expenses and the cost of admission to a Scentsy event in Austin, Texas;

n)   A monthly bill for her cell phone bill and internet access; and

o)   Gas for transportation.

132.   During Plaintiff Wenning's tenure, Scentsy determined the prices at which all products could be sold. She did not have the authority nor ability to sell or advertise prices for Scentsy products at a different price. All sales by any customer that Plaintiff Wenning referred to Scentsy were made through Scentsy-controlled platforms.

133.   In approximately November 2016, Plaintiff Wenning reached the Certified status milestone, thus entitling her to a monthly 5% increase in her commission per product sold as a "Certified" Consultant per the terms of the Primary Agreement. Plaintiff Wenning was entitled to this increase regardless of her monthly PRV and was entitled to 60 days notice of any change.

134.   On or after March 13, 2025, Plaintiff Wenning visited her Scentsy Workstation and was presented with the new 2025 Agreement. She was unable to conduct any work unless she accepted the Agreement. Left with no other option, she was forced to acquiesce to the 2025 Agreement. Consequently, she lost her lifetime 5% commission bonus that she had earned as well as her right to receive 60-day notice of future changes to the compensation structure.

135.   Plaintiff Wenning had not received notice of the change at any point prior to logging on to her Scentsy Workstation in or around mid-March. While the 2025 Agreement was dated April 1, 2025, she later learned that Scentsy would implement the change in compensation retroactively.

136.   Many of the sales that Plaintiff Wenning received and continues to receive after being forced to agree to the 2025 Agreement were because of work she put in over her months and years with Scentsy, work for which she was not paid a wage and had been assured she would receive the 5% commission bonus for once she hit the Certified status. Under the 2025 Agreement, she became obligated to sell a higher number of products to get the 25% commission to which she should have been able to receive under the prior compensation structure, or would earn 5% less commission on sales. On or around April 29, 2025, Plaintiff Wenning received two sales, totaling $132.63. For these sales, she earned only a 20% commission, a total of approximately $26.52, when her

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

compensation plan called for her to earn 25% commission, or $33.16 for at least 60 more days after being informed of the change, if not for longer. For the month of March 2025, Plaintiff Wenning received a total of $870.20 in sales. For these sales, she earned only a 20% commission, a total of approximately $174.04, when her compensation plan called for her to earn 25% commission, or $217.55. Even before the obligatory 2025 Agreement was ostensibly to take effect, Scentsy withheld 5% of the commission Plaintiff Wenning earned, approximately $43.51 of her earnings.

137.    During Plaintiff Wenning's tenure, including during the last four years, Plaintiff Wenning was not compensated for her time doing any of the activities described herein, nor paid any overtime.

138.    During Plaintiff Wenning's tenure, she spent significant money out of pocket. Plaintiff Wenning was not compensated for out-of-pocket expenses.

139.    All commissions were paid via direct deposit. No paystub was provided that identified hours worked, nor were any employment taxes withheld at any time.

### 2.    Plaintiff Cherity Bentley

140.    Plaintiff Cherity Bentley acted as an Scentsy Consultant, enrolling on or around September 29, 2023, and terminated her relationship with Scentsy on March 28, 2025.

141.    When she signed up on or around September 29, 2023, Scentsy required Plaintiff Bentley to adhere to its many rules and policies, as well as its compensation plan, codified in the form of the Primary Agreement and the Compliance Guide. Plaintiff Bentley was not engaged in an independently established trade, occupation, or business as a sales professional and had limited sales experience.

142.    Around the time she signed up, Plaintiff Bentley filled out her profile using the Scentsy Workstation.

143.    Scentsy also provided Plaintiff Bentley with a personalized Scentsy website URL for her Replicated Website and instructed her to provide it to prospective customers.

144.    At no time was Plaintiff Bentley instructed to focus on in-person sales. As a general matter, Plaintiff Bentley understood from communications, directives, and practices of Scentsy that sales efforts were to be predominately online.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

145. During her tenure as a Consultant on behalf of Scentsy, Plaintiff Bentley predominately marketed Scentsy products on various social media platforms, including Facebook. To carry out this marketing work, Plaintiff Bentley performed the following tasks:

    a) Purchased, studied, and tested Scentsy products;

    b) Used the Scentsy Workstation to keep up with Scentsy trainings and new product launches;

    c) Studied Scentsy's new product launches so she could effectively position newly released Scentsy products;

    d) Posted on her social media pages about Scentsy products, including brainstorming content, drafting and editing the text, and selecting Scentsy-issued photographs for each post, as well as incorporating Scentsy-approved messaging for many, if not all, of her posts;

    e) Developed and followed up with Scentsy sales leads;

    f) Regularly monitored the Scentsy Website and Workstation as well as her own social media pages to engage further with customers, and replied to any direct messages from interested customers;

    g) Hosted online private groups via Plaintiff Bentley's social media pages;

    h) Purchased various Scentsy wax bars, which she then broke into smaller pieces from which to create samples which she then distributed to potential customers via mailers;

    i) Purchased Scentsy-issued felt swatches which she then scented using Scentsy fragrances and distributed as these samples to potential customers via mailers;

    j) Evaluated customer's needs, lifestyle, and goals to put together customized Scentsy product bundles for her customers.

146. Plaintiff Bentley performed all these tasks regularly throughout her tenure, typically spending about 20 to 25 hours a week, daily working for periods of 3 to 4 hours. Plaintiff Bentley performed these activities nearly every day, including on weekends.

147. Plaintiff Bentley rarely, if ever, sold to customers in-person, and her advertising and messaging was done online.

148. Plaintiff Bentley, like all Consultants, worked under Scentsy's pervasive control and direction. Selling Scentsy products—the main responsibility of Consultants—is work that is precisely in line with Scentsy's usual course of business.

149. Plaintiff Bentley paid for the following out-of-pocket work-related expenses throughout her tenure:

a) The $15.00 monthly Consultant Personal Website Fee;

b) A starter kit;

c) A multitude of various scent bars, which she broken into smaller pieces and distributed as samples;

d) Stamps and envelopes for use in creating mailers of Scentsy samples for potential customers;

e) Scentsy-issued felt fabric swatches to scent using Scentsy fragrance and distribute as samples;

f) Scentsy-issued order forms;

g) Scentsy-issued scent warmers;

h) Seasonally released product kits;

i) Travel expenses for a Scentsy Consultant event held in Ontario, California;

j) A monthly bill for her cell phone bill and internet access; and

k) Gas for transportation.

150. During Plaintiff Bentley's tenure, Scentsy determined the prices at which all products could be sold. She did not have the authority nor ability to sell or advertise prices for Scentsy products at a different price. All sales by any customer that Plaintiff Bentley referred to Scentsy were made through Scentsy-controlled platforms.

151. On March 28, 2025, Plaintiff Bentley attempted to log in to her Workstation, so that she could obtain her 1099 documents, which she required to prepare her state and federal taxes, due April 15, 2025. Upon logging in, her Workstation displayed the 2025 Agreement. Plaintiff Bentley

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

was not given the option to retrieve her financial statements and could only view the 2025 Agreement along with the options to either accept or decline. At this point, Plaintiff Bentley did not intend to assent to the 2025 Agreement, she merely wished to retrieve her financial statements. Plaintiff Bentley contacted Scentsy support to ask that her Workstation be unlocked. Scentsy support informed Plaintiff Bentley that to retrieve the documents, she would need to either accept the 2025 Agreement, or alternatively, contact Scentsy's legal team.

152.    Plaintiff Bentley learned that Scentsy's legal team took days to weeks to retrieve documents upon request and that because it was tax season, Scentsy's legal team had a backlog. Plaintiff Bentley was put in an impossible position, as she needed her financial documents as soon as possible so that she could perform the time-consuming task of preparing her taxes. Plaintiff Bentley felt that she must accept the 2025 Agreement under duress, because otherwise, she could face serious financial and legal repercussions from potentially improperly filing her taxes, or from filing them late.

153.    Plaintiff Bentley stopped selling for Scentsy on March 28, 2025. Plaintiff Bentley did not receive a final paycheck for unpaid wages within 72 hours of her resignation.

154.    During Plaintiff Bentley's tenure, Plaintiff Bentley was not compensated for her time doing any of the forementioned activities, nor paid any overtime.

155.    During Plaintiff Bentley's tenure, she spent significant money out of pocket. Plaintiff Bentley was not compensated for out-of-pocket expenses.

156.    All commissions were paid via direct deposit. No paystub was provided that identified hours worked, nor were any employment taxes withheld at any time.

V.    **CLASS ALLEGATIONS**

157.    Plaintiffs incorporate and reallege the above paragraphs.

158.    Plaintiffs bring this action on their own behalf, as well as on behalf of each and all other persons similarly situated, and thus seek class certification under California Code of Civil Procedure section 382.

159.    All claims alleged herein arise under California law for which Plaintiffs seek relief authorized by California law.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

160.    Plaintiffs' proposed Classes and Subclasses consist of and are defined as follows:

**California Class:** All current and former Consultants who resided in the State of California or who performed marketing or sales activities in California during the applicable statutes of limitations through the date a class is certified.

**The Above-Standard Minimum Wage Subclass:** All Class members who resided in California cities or counties with a minimum wage rate greater than the California minimum wage during the applicable statutes of limitations through the date a class is certified. This subclass includes, but is not limited to, residents of Los Angeles (City and County), San Francisco, San Diego, Oakland, and San Jose.

**Nationwide Class**: All current and former Consultants in the United States who enrolled prior to the introduction of the 2025 Agreement and who later became bound to the 2025 Agreement.

**Nationwide Contract Damages Subclass**: All Nationwide Class Members who achieved a rank of "Certified" before the introduction of the 2025 Agreement and who sold a Scentsy product on or after March 1, 2025 for a rate of commission less than 25% through the date a class is certified.

161.    Plaintiffs reserve the right to redefine the Classes and Subclasses and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

162.    ***Ascertainable and numerous.*** The Classes and Subclasses are ascertainable and numerous such that joinder is impractical. The membership of each entire Class and Subclass is unknown to Plaintiffs at this time. However, the Classes and Subclasses will likely consist of thousands of members, the precise number which is within the knowledge of and can be readily ascertained through Scentsy's records.

163.    ***Community of Interest.*** There is a well-defined community of interest amongst class members. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because the Nationwide Class and Subclass is numerous and their membership is geographically widespread across the United States and because the California Class and Subclass are numerous and their membership is geographically spread throughout the state of California.

164.    A class action will achieve economies of time, effort and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire class. In addition:

165.   ***Predominating Common Questions.*** There are numerous questions of law and fact common to each Class and Subclass which predominate over any questions affecting only individual members of the Classes and Subclasses. Among the questions of law and fact common to the Classes and Subclasses are:

a)   Whether Scentsy misclassified California Class and Subclass Members as independent contractors when in fact they were Scentsy employees;

b)   Whether Scentsy failed to pay Plaintiffs and California Class and Subclass Members the legally mandated minimum wage for all hours worked;

c)   Whether Scentsy failed to pay Plaintiffs and the California Class and Subclass Members overtime wages;

d)   Whether Scentsy failed to timely pay wages due to Plaintiffs and the California Class and Subclass Members during their employment;

e)   Whether any misclassification by Scentsy was voluntary and knowing;

f)   Whether Consultants' duties fall within the Direct Sales Exemption to AB5;

g)   Whether Scentsy controlled the manner and means of the Consultants' work;

h)   Whether Scentsy failed to reimburse Consultants' business expenses;

i)   Whether Scentsy failed to maintain accurate time records for its Consultants;

j)   Whether Scentsy failed to provide complete and accurate wage statements to its Consultants;

k)   Whether Scentsy failed to pay Consultants their wages due at termination, including commissions;

l)   Whether Scentsy should be enjoined from continuing the practices described herein; and

m)  Whether Scentsy breached its obligations owed the Nationwide Class Members and the Nationwide Contract Damages Subclass and whether these Class and Subclass Members suffered damages as the result of this breach.

166.   ***Typicality.*** Plaintiffs' claims are typical of the claims of class members because Plaintiffs, like all members of the California Class and Subclass worked as Consultants for Scentsy

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

in California, were required to adhere to Scentsy's policies, and were paid on a commission basis. Furthermore, like all members of the Classes and Subclasses, Plaintiffs sustained damages from Scentsy's wrongful conduct. Accordingly, Plaintiffs have no interests antagonistic to the interests of any other member of the Classes and Subclasses.

167. **Adequacy.** Plaintiffs will fully and adequately assert and protect the interests of the Classes and Subclasses and have retained counsel who are experienced in prosecuting class actions. Plaintiffs acknowledge that they have an obligation to make known to the Court any relationship, conflicts or differences with any Class or Subclass Member. Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes and Subclasses.

## VI. FACTS RELATING TO PLAINTIFFS AS A PRIVATE ATTORNEY GENERAL

168. At all times set forth herein, PAGA was applicable to Plaintiffs' employment by Defendants.

169. At all times set forth herein, PAGA provides that, notwithstanding any other provision of law, any provision of law under the California Labor Code that provides for a civil penalty, including unpaid wages and premium wages, to be assessed and collected by the California Labor & Workforce Development Agency ("LWDA") for violations of the California Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of the aggrieved employee and other current or former employees pursuant to procedures set forth in California Labor Code section 2699.3.

170. Pursuant to PAGA, a civil action may be brought by an "aggrieved employee," who is any person that was employed by the alleged violator and against whom one or more of the alleged violations was committed.

171. Plaintiffs were employed by Defendants and the alleged violations were committed against them and they are, therefore, aggrieved employees. Likewise, the other Consultants who worked within the relevant time are "aggrieved employees" as defined by California Labor Code

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1  section 2699(c) in that they are current or former employees of Defendants and one of more of the

2  alleged violations were committed against them.

3       172.   Pursuant to California Labor Code sections 2699.3 and 2699.5, an aggrieve employee,

4  such as each Plaintiff, may pursue a civil action arising under PAGA after the following

5  requirements have been met:

6         a)  The aggrieved employee shall give written notice (hereinafter "Employee's

7             Notice") to the LWDA and the employer of the specific provisions of the Labor

8             Code alleged to have been violated, including the facts and theories to support the

9             alleged violations.

10        b)  The LWDA shall provide notice (hereinafter "LWDA Notice") to the employer

11            and the aggrieved employee that it does not intend to investigate the alleged

12            violation within sixty (60) calendar days of the postmark date of the Employee's

13            Notice.

14        c)  Upon receipt of the LWDA Notice, or if the LWDA Notice is not provided within

15            sixty-five (65) calendar days of the Employee's Notice, the aggrieved employee

16            may commence a civil action pursuant to California Labor Code section 2699 to

17            recover civil penalties in addition to any other penalties to which the employee

18            may be entitled.

19       173.   Plaintiffs have satisfied the statutory exhaustion requirements. On May 8, 2025,

20  Plaintiffs provided notice by electronic submission to the LWDA and by certified mail to all

21  Defendants regarding the specific provisions of the California Labor Code alleged to have been

22  violated, including the facts and theories to support the alleged violations, pursuant to § 2699.3. A

23  true and correct copy of that notice letter is attached as **Exhibit E**. The LWDA has not expressly

24  stated that it will intervene or investigate, or otherwise responded regarding Plaintiffs' asserted

25  PAGA claims against Defendants herein.

26  / / /

27  / / /

28  / / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Failure to Pay Minimum Wages and Liquidated Damages**
**(On Behalf of Plaintiffs, the California Class and the Above-Standard Minimum Wage Class)**
**Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001**
**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive**

174.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

175.   At all relevant times, California Labor Code §§ 1182.12, 1194, 1197, 1197.1, and 1198 have provided that the minimum wage for employees fixed by the Industrial Welfare Commission is the minimum wage to be paid to employees, and the payment of a wage less than the minimum so fixed is unlawful. California law provides employees in California must be paid for all hours worked, up to 40 per week or eight (8) per day, at a regular time rate no less than the mandated minimum wage. Compensable work time is defined by the applicable wage order as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. Tit. 8, § 11070(2)(G) (defining "Hours Worked").

176.   As alleged herein, during the relevant time period, Scentsy maintained and still maintains a policy of requiring employees to work off-the-clock, without compensation. Scentsy only compensates Consultants, including Plaintiffs, based on specific sales placed through the Scentsy website, and does not pay wages for other hours worked. These hours include time spent doing the following, *inter alia*:

   a)  in training;

   b)  making and responding to social media posts;

   c)  purchasing inventory from Scentsy;

d) communicating with other Consultants about policies, practices, and sales instructions and guidance;

e) communicating with customers after their purchases were made to handle routine customer service; and

f) handling other responsibilities as needed.

Plaintiffs and Class Members performed these activities throughout the day, nearly every day, often in short increments adding up to twelve hours a day.

177. Scentsy provided no way for Plaintiffs, the California Class Members, and the Above-Standard Minimum Wage Subclass Members to log time spent and submit to Scentsy.

178. Scentsy's failure to pay Plaintiffs, the California Class Members, and the Above-Standard Minimum Wage Subclass Members for work, and failure to pay overtime wages owed, also resulted in failures to pay Plaintiffs, the California Class Members, and the Above-Standard Minimum Wage Subclass Members the minimum wage required, in violation of California Labor Code §§ 1182.12, 1194, 1197, 1197.1, 1198. In addition, Scentsy's failure to pay for hours worked is a violation of various municipal and county codes across the state, including, but not limited to City of Los Angeles Municipal Code Art. 7; County of Los Angeles Code § 8.100.040, *et seq*., San Francisco Cal. Code 12R.

179. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for minimum wage violations. *See* Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, failed to pay Plaintiffs and other aggrieved employees the minimum wage and all Defendants are liable for causing this violation under § 558.1.

180. As such, pursuant to California Labor Code § 1194.2, Plaintiffs, the California Class Members, and the Above-Standard Minimum Wage Subclass Members are entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon. Pursuant to § 558(a), Plaintiffs, the California Class Members, and the Above-Standard Minimum

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Wage Subclass Members are also entitled to recover unpaid wages and statutory damages in the amount of $50 for any initial violation per employee for each pay period and $100 for each subsequent violation per employee for each pay period and interest pursuant to § 218.6.

## SECOND CAUSE OF ACTION

**Failure to Pay Overtime Wages and Liquidated Damages**
**(On Behalf of Plaintiff Wenning and the California Class)**
**Cal. Lab. Code §§ 510, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001**
**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive**

181.   Plaintiff Wenning realleges and incorporates by reference all preceding allegations as though fully set forth herein.

182.   California Labor Code § 510 and Wage Order No. 4-2001 require employers to pay no less than one and one-half times the regular rate of pay of the employee for hours worked in excess of eight (8) hours in one workday, for hours worked in excess of forty (40) hours in one workweek, and for the first eight (8) hours worked on the seventh day of work in any one workweek, and to pay no less than twice the regular rate of pay of the employee for hours worked in excess of twelve (12) hours in one workday and for any work in excess of eight (8) hours on any seventh day of a workweek. During the relevant time period, Plaintiff Wenning and other aggrieved employees worked over 8 hours in a day and/or 40 hours in a week without overtime compensation because Scentsy failed to pay them for their work duties, as described above. This was, in turn, due to Scentsy's unlawful misclassification of Consultants as independent contractors rather than as employees. On occasions when Plaintiff Wenning and other aggrieved employees had already worked eight hours in one day (performing all their work off-the-clock), Scentsy failed to pay them any overtime compensation due. Therefore, Plaintiff Wenning and the other aggrieved employees were entitled to receive overtime compensation from Scentsy that Scentsy failed to pay, violating California Labor Code § 510 and Wage Order No. 4-2001. In addition, Scentsy's failure to pay overtime is a violation of various municipal and county codes across the state, including, but not

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1  limited to City of Los Angeles Municipal Code Art. 7; County of Los Angeles Code § 8.100.040,

2  *et seq.*, San Francisco Cal. Code 12R.

3      183.   California Labor Code § 558.1 states that any employer or person acting on behalf of

4  an employer who causes a violation is liable, among other things, for overtime wage violations. *See*

5  Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE

6  THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON;

7  MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50,

8  inclusive, failed to pay Plaintiff Wenning and other aggrieved employees overtime wages and all

9  Defendants are liable for causing this violation under § 558.1.

10      184.   As such, pursuant to California Labor Code § 1194.2, Plaintiff Wenning and the

11  California Class Members are entitled to recover liquidated damages in an amount equal to the

12  wages unlawfully unpaid and interest thereon. Pursuant to § 558(a), Plaintiff Wenning and the

13  California Class Members are also entitled to recover unpaid wages and statutory damages in the

14  amount of $50 for any initial violation per employee for each pay period and $100 for each

15  subsequent violation per employee for each pay period and interest pursuant to § 218.6.

### THIRD CAUSE OF ACTION

**Failure to Provide Rest Periods or Rest Break Premium Wages**
**(On Behalf of Plaintiff Wenning and the California Class)**
**Cal. Lab. Code §§ 226.7, 558.1; IWC Wage Order 4-2001**
**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive**

22      185.   Plaintiff Wenning realleges and incorporates by reference all preceding allegations as

23  though fully set forth herein.

24      186.   California Labor Code § 226.7 and IWC Wage Order 4-2001 require an employer to

25  authorize or permit an employee to take a rest period of ten net minutes for every four hours worked,

26  or major fraction thereof, and such rest periods must be in the middle of the four-hour period insofar

27  as practicable. If the employer fails to provide any required rest periods or fails to provide a fully

28  compliant rest break for a net ten minutes wherein the employee is fully relieved of all duties and

all employer control, the employer must pay the employee one hour of pay at the employee's regular rate of compensation for each workday the employer did not provide a legally required and/or fully compliant rest period.

187.   Scentsy failed to provide Plaintiff Wenning and the California Class all required and/or fully compliant rest periods, or compensation in lieu thereof. Scentsy employed policies and procedures that ensured Plaintiff Wenning and the California Class would not receive all legally required rest periods as Scentsy improperly classified Plaintiff Wenning and the California Class as independent contractors rather than as employees and did not authorize nor permit all required rest periods in strict accordance with the timing requirements of all applicable Wage Orders. Scentsy similarly employed policies and procedures that rendered rest periods non-compliant with the requirements of California law by, *inter alia*, failing to relieve Plaintiff Wenning and the California Class of all duties and all employer control. Scentsy further employed policies and procedures ensuring Plaintiff Wenning and the California Class never received a rest period premium during employment.

188.   California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for rest period violations. *See* Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, failed to provide Plaintiff Wenning and the Class all rest periods or compensation in lieu thereof and all Defendants are liable for causing this violation under § 558.1.

189.   As a result, under California Labor Code § 226.7, Plaintiff Wenning and the California Class are entitled to one additional hour's pay for each day a rest break was missed, late or interrupted, all in an amount according to proof.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOURTH CAUSE OF ACTION**

**Failure to Provide Meal Periods or Meal Premium Wages**
**(On Behalf of Plaintiff Wenning and the California Class)**
**Cal. Lab. Code §§ 226.7, 512(a), 1198, 558.1; IWC Wage Order 4-2001**
**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN**
**ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK**
**STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50,**
**inclusive**

190.   Plaintiff Wenning realleges and incorporates by reference all preceding allegations as though fully set forth herein.

191.   Under California Labor Code §§ 226.7, 512(a), 1198, and IWC Wage Order 4-2001, Scentsy was required to provide Plaintiff Wenning and California Class Members with one thirty-minute meal break free from all duties for all shifts longer than five (5) hours, and a second thirty-minute meal break free from all duties for all shifts longer than 10 hours and a third thirty-minute meal break free from all duties for all shifts longer than 15 hours. Employers covered by the Wage Orders have an obligation to both (1) relieve their employees for at least one meal period for shifts over five hours, and (2) to record having done so. If the employer fails to properly record a valid meal period, it is presumed no meal period was provided. Section 226.7 also requires an employer to pay mandated premiums of an extra hour of wages to any employees who have not been provided with a timely meal or rest break.

192.   As alleged herein, Plaintiff Wenning and the California Class regularly worked periods of more than five (5), ten and fifteen hours in a workday without being provided requisite mandatory timely, thirty-minute, duty-free meal periods. Scentsy also failed to pay Plaintiff Wenning and the California Class an additional hour of wages at her regular rate for each workday a meal period and/or a legally compliant meal period was not provided.

193.   Scentsy failed to provide Plaintiff Wenning or the other aggrieved employees with an opportunity to take timely, uninterrupted meal periods of the requisite length, free from employer control. Scentsy also failed to compensate Plaintiff Wenning and the other aggrieved employees properly for the non-compliant meal periods including, inter alia, missed, short, late, and/or interrupted meal periods. Scentsy also failed to pay premium wages for the many meals that Plaintiff

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Wenning and the aggrieved employees were deprived of. Indeed, Scentsy did not provide any meal breaks or premium compensation for missed breaks to Plaintiff Wenning or other aggrieved employees, since Scentsy improperly classified its Consultants as independent contractors who were not entitled to meal breaks.

194.  California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for meal period violations. *See* Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, failed to provide Plaintiff Wenning and other aggrieved employees all meal periods or compensation in lieu thereof and all Defendants are liable for causing this violation under § 558.1.

195.  As a result, under California Labor Code § 226.7, Plaintiff Wenning and the California Class are entitled to one additional hour's pay for each day a meal period was missed, late or interrupted, all in an amount according to proof.

## FIFTH CAUSE OF ACTION
### Failure to Timely Pay Wages During Employment
### (On Behalf of Plaintiffs and the California Class)
### Cal. Lab. Code §§ 204, 210(a), 218.6
### Against SCENTSY, INC. and DOES 1–50, inclusive

196.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

197.  At all relevant times herein set forth, California Labor Code § 204 requires that all wages earned by any person in any employment between the 1st and the 15th days, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the 16th and the 26th day of the month during which the labor was performed, and that all wages earned by any person in any employment between the 16th and the last day, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the 1st and the 10th day of the following month.

198.   California Labor Code § 204 also requires that all wages earned for labor more than the normal work period shall be paid no later than the payday for the next regular payroll period.

199.   During the relevant period, Scentsy failed to pay Plaintiffs and the California Class, as well as all other aggrieved employees, all wages due to them, including minimum wages, overtime wages, and meal and rest period premium wages, within any time period specified by § 204. Moreover, Scentsy failed to pay Plaintiffs or other aggrieved employees earned commissions in a timely and complete fashion.

200.   As such, pursuant to California Labor Code § 210(a), Plaintiffs and the California Class Members are entitled to recover statutory damages in the amount of $100 for any initial violation per failure to pay each employee and $200 for each subsequent, or willful or intentional violation for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld, and interest pursuant to § 218.6.

### SIXTH CAUSE OF ACTION

**Failure to Timely Pay All Earned and Unpaid Wages Upon Separation of Employment**
**(On Behalf of Plaintiff Bentley and the California Class)**
**Cal. Lab. Code §§ 201-203, 558.1**
**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive**

201.   Plaintiff Bentley realleges and incorporates by reference all preceding allegations as though fully set forth herein.

202.   At all times relevant herein set forth, California Labor Code §§ 201 and 202 provide that if an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately, and that if an employee voluntarily leaves their employment, their wages shall become due and payable not later than seventy-two (72) hours thereafter, unless the employee has given seventy-two (72) hours previous notice of their intention to quit, in which case the employee is entitled to their wages at the time of quitting. California Labor Code § 203 provides that, at the time of termination of employment, the employer must pay an employee all wages due and owing within the time frames set forth in §§ 201, *et seq*. If an employer willfully refuses to pay,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

without abatement or reduction, in accordance with §§ 201 and 202, any wages of an employee who is discharged or who quits, the employee's wages shall continue as a penalty for up to thirty (30) days from the due date, until paid or until an action to recover those wages is commenced.

203.    As alleged herein, following Plaintiff Bentley's final day of employment, Scentsy willfully failed to pay Plaintiff Bentley and the California Class all wages due and owing within the deadlines set forth in California Labor Code §§ 201, *et seq*., including unpaid overtime wages and wages for missed/noncompliant meal and rest periods.

204.    California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for failure to pay all wages at the time of termination. *See* Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, failed to pay all wages at the time of termination of Plaintiff Bentley and the California Class Members and all Defendants are liable for causing this violation under § 558.1.

205.    Pursuant to California Labor Code § 203, Plaintiff Bentley and the California Class are entitled to recover waiting time penalties of up to thirty (30) days' pay, plus attorneys' fees and costs, in an amount according to proof.

### SEVENTH CAUSE OF ACTION

**Failure to Keep Requisite Payroll Records**
**(On Behalf of Plaintiffs and the California Class)**
**Cal. Lab. Code § 1174(d), 1174.5**
**Against SCENTSY, INC. and DOES 1–50, inclusive**

206.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

207.    California Labor Code § 1174(d) requires an employer to keep, at a central location in the state or at the plants or establishments at which employees are employed, payroll records showing the hours worked daily by and the wages paid to, and the number of piece-rate units earned by and any applicable piece rate paid to, employees employed at the respective plants or

establishments. These records shall be kept in accordance with rules established for this purpose by the commission, but in any case, shall be kept on file for not less than two years.

208.    At all times herein set forth, California Labor Code § 1174.5 has imposed a civil penalty of $500 per aggrieved employee for each willful failure "to maintain . . . accurate and complete records required by subdivision (d) of Section 1174[.]"

209.    Scentsy has intentionally and willfully failed to keep accurate and complete payroll records showing the hours worked daily and the wages paid to Plaintiffs. For example, any records kept by Scentsy did not include the hours worked off-the-clock, the premium wages owed, and for missed and non-compliant meal and rest breaks.

210.    Plaintiffs have been injured by Scentsy's intentional and willful violation of California Labor Code § 1174(d) because they were denied both their legal right and protected interest, in having available, accurate and complete payroll records pursuant to § 1174(d).

### EIGHTH CAUSE OF ACTION

**Failure to Provide Timely and Accurate Wage Statements**
**(On Behalf of Plaintiffs and the California Class)**
**Cal. Lab. Code §§ 226(a), 1198, 226.3, 558.1, 226(e)**
**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive**

211.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

212.    At all relevant times herein set forth, California Labor Code § 226(a) provides that, at the time of each payment of wages, the employer must provide each employee with an itemized statement showing gross wages earned, total hours worked, all deductions taken, net wages earned, the inclusive dates for which the employee is being paid, the employee's name and last four digits of their social security number, the name and address of the legal entity that is the employer, and all applicable hourly rates in effect during the pay period and all hours worked at each rate.

213.    California Labor Code § 1198 provides that the maximum hours of work and the standard conditions of labor shall be those fixed by the Labor Commissioner and as set forth in the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

applicable IWC Wage Orders. Section 1198 further provides that "[t]he employment of any employees for longer hours than those fixed by the order or under conditions of labor prohibited by the order is unlawful." Pursuant to the applicable IWC Wage Order, employers are required to keep accurate time records showing when the employee begins and ends each work period and meal period.

214.   At all times herein set forth, California Labor Code § 226.3 has imposed a civil penalty in addition to any other penalty provided by law of two hundred fifty dollars ($250) per aggrieved employee for the first violation of § 226(a), and one thousand dollars ($1,000) per aggrieved employee for each subsequent violation.

215.   As alleged herein, Scentsy knowingly and willfully failed to provide Plaintiffs and the California Class with proper, itemized wage statements. Wage statements provided to Plaintiffs and the California Class did not show total/actual hours worked and all applicable hourly rates in effect during the pay period and all hours worked at each rate. The wage statements provided to Plaintiffs and the California Class failed to reflect all time spent in training, making and responding to social media posts, making business expenditures by stocking their own Scentsy inventory, and communicating with other Consultants about policies, practices, and sales instructions and guidance, *inter alia*. Scentsy's refusal to properly record this time, and to include it in its itemized wage statements, or to properly pay its employees for this time was willful and intentional. As a result of these violations, Plaintiffs and the California Class suffered injury because they were not paid for all hours worked.

216.   California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for wage statement violations. *See* Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, failed to provide Plaintiffs and the California Class accurate wage statements and all Defendants are liable for causing this violation under § 558.1.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

217.   Pursuant to California Labor Code § 226(e), Plaintiffs and the California Class are entitled to a penalty in the amount of fifty dollars ($50) for the initial pay period in which a violation occurred, and a penalty of one-hundred dollars ($100) for each violation in a subsequent pay period, up to an aggregate penalty of four-thousand dollars ($4,000), as well as costs of suit and attorneys' fees, all in an amount according to proof.

## NINTH CAUSE OF ACTION

### Failure to Reimburse Business Expenses
### (On Behalf Plaintiffs and the California Class)
### Cal. Lab. Code §§ 450, 2802, 558.1; IWC Wage Order 4-2001
### Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive

218.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

219.   At all times herein set forth, California Labor Code § 2802 has provided and provides that an employer must reimburse employees for all necessary expenditures and losses incurred by the employee in the performance of their job. The purpose of § 2802 is to prevent employers from passing off their cost of doing business and operating expenses on to their employees. *Cochran v. Schwan's Home Service, Inc.*, 228 Cal. App. 4th 1137, 1144 (2014). The applicable wage order, IWC Wage Order 4-2001, paragraph 9(B) provides that: "When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft." Scentsy's conduct, in misclassifying their Consultants as independent contractors and failing to reimburse them for expenses Consultants paid that should have been borne by their employer, constitutes a violation of California Labor Code §§ 450 and 2802.

220.   Scentsy violates California Labor Code § 2802 by having failed, and failing, to reimburse Plaintiffs and the California Class for their business-related expenses. Scentsy charged

Plaintiffs and the California Class a "Personalized Website Subscription" of $15/month which Scentsy did not reimburse. And during the relevant period, Scentsy, required that Plaintiffs and the California Class spend their own money on the following instrumentalities of their work:

a) their own personal cellular phones and/or cellular phone data to carry out Scentsy's business operations, which Plaintiffs and the California Class were required to use to make social media posts and communicate with customers and their upline;

b) their home internet connection;

c) Scentsy Starter Kits, which all Consultants are required to purchase at the time of enrollment;

d) seasonally released Product Kits stocked with newly released Scentsy products, which Plaintiffs and the California Class were required to demonstrate and position to customers as part of their marketing and sales activities;

e) Scentsy scent warmers;

f) all the supplies required to create and distribute samples of Scentsy products to prospective customers, including, *inter alia*, various scented wax bars, which Consultants broke into smaller pieces and from which they assembled sample kits; Scentsy-issued baggies to hold these wax samples; Scentsy-issued felt fabric swatches to scent with Scentsy fragrances; stamps and envelopes for use in creating mailers of Scentsy samples; and Scentsy-issued scratch-and-sniff stickers;

g) Scentsy-issued sales catalogues and order forms;

h) business cards;

i) travel expenses and the cost of admission to Scentsy events; and,

j) gasoline.

Scentsy failed to reimburse Plaintiffs and the California Class for the full costs their work-related expenses, including the expense incurred securing all of the above.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

221.   Scentsy's company-wide policy and/or practice of passing on their operating costs to Plaintiffs and the California Class violates California Labor Code § 2802. At all times described herein, Scentsy has acted willfully, and deliberately with oppression, fraud and malice to unlawfully deprive their employees of the employees' own personal resources in furtherance of Scentsy's profits.

222.   California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for failure to reimburse business expenses. *See* Cal. Lab. Code § 558.1. Defendants SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive, failed to reimburse business expenses to Plaintiffs and the California Class and all Defendants are liable for causing this violation under § 558.1.

223.   As a result of Scentsy's failure to reimburse Plaintiffs and the California Class for all business-related expenses, pursuant to California Labor Code § 2802, Plaintiffs and the California Class are entitled to recover unreimbursed business expenses, plus attorneys' fees and costs, in an amount according to proof.

## TENTH CAUSE OF ACTION

**Breach of Contract/Declaratory Relief**
**(On Behalf of Plaintiffs and the Nationwide Class)**
**Against SCENTSY, INC. and DOES 1–50, inclusive**

224.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

225.   In or around mid-March, Scentsy sought to amend the Primary Agreement and compensation structure therein. To force Members of the Nationwide Class to agree to the 2025 Agreement, including forcing Members of the Nationwide Contract Damages Subclass to be bound by a less favorable compensation structure and to waive their right to a 60-day notice of a change to that compensation policy, Scentsy locked Nationwide Class Members out of their Workstations until they acquiesced to the 2025 Agreement. In so doing, members of the Nationwide Class were

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

unable to access their Workstation and perform their marketing and sales work until they accepted or declined the 2025 Agreement. Likewise, Scentsy only made tax documents, such as 1099s, available through Consultant Workstations, forcing those Consultants who needed to complete taxes, to agree to the new terms to avoid tax consequences. Consultants who declined to agree to the new terms would be terminated, entitling them to no future commissions.

### *Request for Declaratory Relief*

226.   Plaintiffs, like all Nationwide Class Members, were both forced to acquiesce to the 2025 Agreement under duress and through unconscionable means.

227.   Because Scentsy offered no compensation or other consideration to the Nationwide Class in exchange for them acquiescing to the 2025 Agreement, and consent was obtained by duress and through unconscionable means, Plaintiffs, on behalf of the Nationwide Class, seek a declaration that the 2025 Agreement is void and unenforceable.

### *Breach of Contract Damages*

228.   Pursuant the Primary Agreement, once a Consultant reaches a lifetime PRV of 1,000 (i.e., sells approximately $1,000-$2,000 of products at retail), they become "Certified for life," which entitles them to an automatic 5% increase in their commission each month from that point on, from 20% to 25%. Under the terms of the Primary Agreement, Scentsy agreed to provide 60 days notice of any change to the compensation structure.

229.   Because the 2025 Agreement is void and unenforceable and Scentsy has not given notice of the change to its commission structure, Scentsy is bound and continues to be bound by the terms of the Primary Agreement. Beginning on March 1, 2025, Scentsy breached the terms of the Primary Agreement as to all Members of the Nationwide Contract Damages Subclass by imposing a new condition on their right to receive 25% commission on sales. Rather than pay 25% commission on all sales to all Consultants at the Certified level, starting on March 1, 2025, Scentsy would only pay 25% commission to those Consultants at the Certified level who sold had sold at least 250 PRV ($250-$500 at retail) during the month. As a result, Plaintiff Wenning and the Nationwide Contract Damages Subclass were paid 20% commission on all sales.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

230.   Nationwide Contract Damages Subclass Members continue to be bound by the Primary Agreement but continue to be paid commission under the terms of the void 2025 Agreement.

231.   By refusing to pay Nationwide Contract Damages Subclass Members the full commission as required by the terms of the Primary Agreement, Scentsy is in breach, and Nationwide Contract Damages Subclass Members are damaged in the amount of the commission differential for any month in which Scentsy paid them less than a 25% commission rate until 60 days after the date on which Scentsy provides notice under the terms of the Primary Agreement.

232.   In the alternative, the 2025 Agreement, while void as a contract, constituted notice of the change in commission structure. Scentsy breached the terms of the Primary Agreement by implementing the change in commission structure immediately and retroactively, rather than provide the requisite 60-day notice through Scentsy Workstations.

233.   Rather than implement the change 60 days after Consultants were informed of the change, or approximately May 13, 2025, Scentsy implemented it on March 1, 2025.

234.   From the period beginning March 1, 2025 and continuing for 60 days after notice of the new compensation policy contained in the void 2025 Agreement was provided, Scentsy withheld and continues to withhold 5% commission on sales made by Plaintiff Wenning and the Nationwide Contract Damages Subclass, unless those Members had sold at least 250 PRV ($250-$500 at retail). The Nationwide Contract Damages Subclass has been damaged, at a minimum, in the amount of the commission differential for any sale in which Scentsy paid them less than a 25% commission rate between March 1 and 60 days after delivery of notice (approximately May 13, 2025).

### ELEVENTH CAUSE OF ACTION

**Unfair Competition**
**(On Behalf of Plaintiffs and the California Class)**
**Bus. & Prof. Code § 17200 *et seq*.**
**Against SCENTSY, INC. and DOES 1–50, inclusive**

235.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

236. From a date unknown to Plaintiffs and continuing to the present, Scentsy has and continues to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful and unfair within the meaning of that statute.

### *"Unlawful" Prong*

237. Scentsy has violated section 17200's prohibition on unlawful conduct through the following violations:

    a) Failing to pay minimum wages, as set forth in Paragraphs 174–80;

    b) Failing to pay overtime wages, as set forth in Paragraphs 181–84;

    c) Denying rest periods and/or failing to pay rest break premium wages, as set forth in Paragraphs 185–89;

    d) Failing to provide meal periods and/or pay associated premium wages, as set forth in Paragraphs 190–95;

    e) Failing to timely pay wages during employment, as set forth in Paragraphs 196–200;

    f) Failing to timely pay all earned and unpaid wages upon separation of employment, as set forth in Paragraphs 201–05;

    g) Failing to keep requisite payroll records, as set forth in Paragraphs 206–10;

    h) Failing to provide timely and accurate wage statements, as set forth in Paragraphs 211–17;

    i) Failing to reimburse business expenses, as set forth in Paragraphs 218–23; and

    j) Breaching its contract with its Consultants, as set forth in Paragraphs 224–34.

### *"Unfair" Prong*

238. Scentsy has violated California Business and Professions Code § 17200's prohibition on unfair conduct by engaging in each of the forgoing unlawful acts.

239. Furthermore, as set forth *supra* Section IV.B.6, Scentsy has violated section 17200's prohibition on unfair conduct by unfairly and unconscionably structuring its Primary Agreement and business activities in a way that does not create meaningful opportunities for Consultants earn

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

a fair wage and/or commission for their work. Scentsy used its superior bargaining power, superior market power, and take-it-or-leave-it Primary Agreement to prevent Consultants from exercising discretion and accessing tools and resources needed to market the products effectively and competitively to generate profits. And Scentsy further undermined Consultants' ability to earn compensation by engaging in activities in competition with the Consultants, by for example, maintaining the exclusive right to disseminate online advertising to any customer sales leads generated by the Consultants and selling products via Amazon.com. By denying Consultants meaningful opportunities to earn fair commission, Scentsy also unfairly incentivized Consultants to divert time and attention away from marketing the sale of products to retail customers to marketing the opportunity to become a Consultant to unsuspecting members of the California public. So long as Defendants continue these unfair practices, the California public remains at risk for being recruited into Scentsy and similarly harmed.

240.   Scentsy's unfair acts were in contravention of public policy. California public policy encourages the proper classification of workers to ensure that workers are fairly compensated and provided the full benefits and protections of employment, competitors are operating in a fair and honest marketplace, and the state is not deprived of tax revenue.

241.   Scentsy's unfair acts were immoral, unethical, oppressive, unscrupulous, and substantially injurious to the California Class and general public. Scentsy knowingly and willfully classified the Consultants as independent contractors. And it knowingly and willfully structured an unfair and unconscionable Primary Agreement that does not provide for meaningful opportunities to earn compensation, while engaging in business activities that would further frustrate Consultants' efforts to earn compensation.

242.   The impact on the California Class and the general public is not outweighed by any countervailing benefits. To the extent any benefits inured to Plaintiffs, the California Class, and the general public, those benefits are outweighed by the impact of Defendants' unfair acts. Consultants, including Plaintiffs, incurred substantial costs in working as Consultants, and were not paid appropriately and fairly for their time and efforts. They could have chosen other opportunities or invested that time and money into other legitimate and fairly paying endeavors.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

243.   As a result of Scentsy's unfair competition as alleged herein, Plaintiffs and the California Class have suffered injury in fact and lost money or property, as described in more detail above. Pursuant to California Business and Professions Code § 17200, *et seq.*, Plaintiffs and the California Class are entitled to restitution of all wages and other monies rightfully belonging to them that Scentsy failed to pay and wrongfully retained by means of its unlawful and unfair business practices, and and/or all other equitable remedies that may be available.

244.   To prevent Scentsy from continuing to prey on the California public through their misclassification of their Consultants, and recruitment of new Consultants under these false pretenses, Plaintiffs and the California Class also seek a public injunction against Defendants enjoining Scentsy, and any and all persons acting in concert with them, from engaging in each of the California Labor Code violations set forth herein and from recruiting new Consultants or authorizing others to recruit new Consultants, under a misclassified status, including making representations about that status and the commission-based compensation structure.

### TWELFTH CAUSE OF ACTION
**(Violation of Cal. Lab. Code §§ 2698-2699.8)**

**Against SCENTSY, INC.; HEIDI THOMPSON; ORVILLE THOMPSON; DAN ORCHARD; CHUCK THOMPSON; DEB BOWDEN; JOSH ANDERSON; MARK STASTNY; PAUL KLASSEN; RICHARD STEEL; SAM JOHNSON; and DOES 1–50, inclusive**

245.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

246.   PAGA establishes that, notwithstanding any other provision of law, any provision of the California Labor Code which provides for a civil penalty to be assessed and collected by the LWDA, or any of its departments, divisions, commissions, boards, agencies or employees for a violation of the California Labor Code, may be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself, and other current or former employees.

247.   Whenever the LWDA, or any of its departments, divisions, commissions, boards, agencies, or employees has discretion to assess a civil penalty, a court in a civil action is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

248.  Plaintiffs and the other Consultant-employees are "aggrieved employees" as defined by California Labor Code § 2699(c) in that they are all current or former employees of Defendants, and one or more of the alleged violations were committed against them.

249.  Defendants' conduct, as alleged herein, violates numerous sections of the California Labor Code, including, but not limited to, the following:

      k)  Failing to pay minimum wages, as set forth in the First Cause of Action;

      l)  Failing to pay overtime wages, as set forth in the Second Cause of Action;

      m)  Denying rest periods and/or failing to pay rest break premium wages, as set forth in the Third Cause of Action;

      n)  Failing to provide meal periods and/or pay associated premium wages, as set forth in the Fourth Cause of Action;

      o)  Failing to timely pay wages during employment, as set forth in the Fifth Cause of Action;

      p)  Failing to timely pay all earned and unpaid wages upon separation of employment, as set forth in the Sixth Cause of Action;

      q)  Failing to keep requisite payroll records, as set forth in the Seventh Cause of Action;

      r)  Failing to provide timely and accurate wage statements, as set forth in the Eighth Cause of Action;

      s)  Failing to reimburse business expenses, as set forth in the Ninth Cause of Action; and,

      t)  Willfully misclassifying Consultants as independent contractors, in violation of California Labor Code §§ 226.8 and 2775.

250.  Pursuant to PAGA, and in particular California Labor Code §§ 2699(a), 2699.3, and 2699.5, Plaintiffs, acting in the public interest as a private attorneys general, seek assessment and collection of civil penalties for Plaintiffs, all other aggrieved employees, and the State of California against Defendants, in fixed amounts for each aggrieved employee for every pay period in which

1   there was a violation, per § 2699(f), in addition to other remedies, for violations of Labor Code

2   sections set forth herein.

3          251.   Pursuant to California Labor Code § 2699(i), civil penalties recovered by aggrieved

4   employees shall be distributed as follows: sixty-five percent (65%) to the LWDA for the

5   enforcement of labor laws and education of employers and employees about their rights and

6   responsibilities and thirty-five (35%) to the aggrieved employees.

7          252.   Further, and as authorized by the California Labor Code § 2699(g), Plaintiffs each

8   seek recovery of their attorneys' fees and costs.

9   **VIII.   <u>PRAYER FOR RELIEF</u>**

10  WHEREFORE Plaintiffs and the Classes pray for judgment and relief as follows:

11          (1)    An order certifying that this action may be maintained as a class action, that Plaintiffs
12                 be appointed Class Representatives, and that Plaintiffs' counsel be appointed Class
                   Counsel;

13          (2)    Statutory penalties and compensatory damages as authorized under the California
14                 Labor Code;

15          (3)    Civil penalties pursuant to California's Private Attorneys General Act;

16          (4)    Restitution and all other equitable remedies pursuant to California's Unfair
                   Competition Law;

17          (5)    Damages for Scentsy's Breach of Contract;

18          (6)    Public Injunctive relief, pursuant to California's Unfair Competition Law, prohibiting
19                 Scentsy, its officers, agents, employees, and attorneys, and all other persons in active
                   concert or participation with any of them, whether acting directly or indirectly, in
20                 connection with the management, hiring, or coordination of Consultants, or the
                   advertising, promotion, or recruitment of new Consultants, from:

21                 a.   Engaging in the California Labor Code violations as alleged herein, including
22                      classifying Consultants as non-employees or independent contractors;

23                 b.   Recruiting new Consultants or authorizing others to recruit new Consultants,
                        under a misclassified status, including making representations about that status
24                      and the commission-based compensation structure.

25          (7)    Punitive damages against the individual officer, director or managing agent
                   Defendants pursuant to Cal. Civil Code § 3294;

26          (8)    Reasonable attorneys' fees pursuant to the California Labor Code, including §§
27                 226(e), 2699(g), and Code of Civil Procedure § 1021.5;

28          (9)    Costs of this suit per California Labor Code § 2699(g);

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

(10)    Pre- and post-judgment interest pursuant to Labor Code section 218.6; and

(11)    Such other and further relief as the Court may deem just and proper.

## IX.    **DEMAND FOR TRIAL BY JURY**

Plaintiffs and the Classes hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

DATED: July 14, 2025                                    **CLARKSON LAW FIRM, P.C.**

                                                        By: */s/ Kristen G. Simplicio*
                                                            Kristen G. Simplicio
                                                            Glenn A. Danas
                                                            Maxim Gorbunov
                                                            Cody Laux

                                                        *Attorneys for Plaintiffs and Putative Class*